KENNY CONSTRUCTION COMPANY, Plaintiff-Appellee, *v.* HINSDALE SANITARY DISTRICT, Defendant-Appellant.

First District (2nd Division)   No. 81—1443

Opinion filed December 14, 1982.

Antonow and Fink, of Chicago (Alan Borlack and Timothy Kocian, of counsel), for appellant.

O'Brien, Carey, McNamara, Scheuneman & Campbell, Ltd., of Chicago (Donald O'Brien and William Campbell, of counsel), for appellee.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Kenny Construction Company (Kenny) brought this action for breach of contract against the Hinsdale Sanitary District (HSD). The HSD counterclaimed for breach of contract. The jury returned a verdict for Kenny and awarded $700,000 in damages.

This action arose out of a construction contract between Kenny and the HSD for the installation of the Phase V Interceptor Sewer (Phase V project). This project involved the installation of approximately 12,360 lineal feet of sewer line and supporting structures to service the Oak Brook area in Du Page County, Illinois. Initial bids on the project were rejected. When bids were retaken in June, Kenny emerged as the low bidder.

Just prior to the deadline for the June bids, the HSD learned that the village of Oak Brook would be constructing a new roadway along the Jorie Boulevard section of the Phase V project which would require a revision of the original plans and specifications. Preferring not to reschedule the bid date, the HSD issued an "Addendum" to the Phase V bidding documents. The Addendum told the prospective bidders that they should submit their proposals on the basis of the original plans and specifications. Once the extent of the roadway construction along Jorie Boulevard was known and its impact on the cost of that portion of the project could be ascertained, the HSD would treat the roadway improvement as a "changed condition," calling for an

equitable adjustment in the contract price.

Another change affecting the Phase V project resulted from a decision to widen Ginger Creek. The decision was made after the contract was awarded to Kenny but prior to construction. This widening caused the creek to encroach on the sewer alignment for the Ginger Creek section of the Phase V project.

Kenny produced evidence at trial establishing that both the widening of Ginger Creek and the construction of a roadway along Jorie Boulevard prevented Kenny from performing the contract as bid primarily because Kenny's bid proposal for the Jorie Boulevard and Ginger Creek sections of the project was based on the open-cut method of excavation, as opposed to the tunneling method.

Briefly, the open-cut method involves the digging of trenches with a back-hoe from the surface. The trenches are 40 feet wide at the surface and require a much wider work area to move construction equipment and to stockpile the dirt. Evidence adduced at trial indicated that the new dimensions of Ginger Creek and the Jorie Boulevard roadway prevented the use of the open-cut method over large portions of both those sections of the project. Kenny determined that the tunneling method of excavation would have to be used where changes in excavation were necessary.

The tunneling method involves the use of a boring machine which digs a tunnel beneath the surface of the ground. This method of excavation is much more expensive than the open-cut method, and Kenny informed the HSD that to excavate by tunneling rather than by open-cut would involve substantial additional excavation costs for both Jorie Boulevard and Ginger Creek. The HSD did not approve these additional costs but began to explore possible alternative alignments which would avoid such large additional costs.

Actual construction by Kenny began on September 23, 1974. The original plan was to begin by "jacking" the tunnels along the 22d Street, Route 83, and tollway portions of the project before going to Spring Road, 31st Street, and Jorie Boulevard. Jacking is one way of excavating by the tunnel method. It involves the use of a tunnel boring machine (TBM) which "pumps" the pipe in place behind the TBM as the tunnel is being dug. This is the least expensive method of tunneling because it does not require the use of any filler around the pipe or tunnel supports. Both filler and tunnel supports are required for the rib and lag method of tunneling.

The rib and lag method, like jacking, uses a TBM. However, rib and lagging requires a much larger tunnel. As the tunnel is excavated, it is supported by steel ribs joined by wooden lags. Once these

ribs and lags are in place, the pipe is laid in the tunnel and a filler is injected to close the tunnel. The rib and lag method is much more expensive than the jacking method.

Soon after the jacking began, Kenny experienced difficulty. Progress was much too slow and Kenny could not keep the TBM on line. A few days before December 30, 1974, Kenny abandoned jacking in favor of rib and lagging.

About two weeks prior to the change in tunneling method, Kenny submitted its first pay request. Under the contract, the HSD was to make monthly payments based on progress reports submitted by Kenny. These monthly reports were to document the amount of work completed.

After paying on the first progress payment request, the HSD objected to the method used by Kenny in computing the amount of progress payments due. In response to Kenny's threat to pull off the job, the HSD made one more payment on February 19, 1975. The HSD made no further payments.

While the dispute over progress payments was taking place, another dispute centered around the Jorie Boulevard and Ginger Creek sections of the project. Ever since Kenny had projected that the Jorie Boulevard and Ginger Creek lines would have to be installed by the more expensive tunneling method, Lindley (the project engineer) and the HSD had sought to devise an alternate alignment to avoid huge additional costs.

In September 1974, Lindley revised the plans and specifications for the Jorie Boulevard alignment. Kenny produced evidence at trial indicating that this revision failed to alleviate the additional costs because it provided an inadequate work area for the open-cut method to be used.

On February 3, 1975, Lindley produced another revision. Under this revision the Ginger Creek alignment was moved away from the creek to minimize its encroachment into the pipe alignment. However, the creek continued to encroach in at least one section. This revision also imposed a new limitation in that the Ginger Creek segment had to be excavated within a 40-foot-wide easement. The original plans depicted an unlimited work space. The Jorie Boulevard alignment remained the same as in the September revision.

The HSD and Kenny met on February 6 to discuss the Jorie Boulevard and Ginger Creek situations. Kenny suggested that if the Ginger Creek alignment were moved to the south of the creek, they could put the pipe in at the originally projected cost. Kenny also suggested that if the original line along Jorie Boulevard was restored, and a

Commonwealth Edison cable relocated, the Jorie line could also be put in at the original cost.

The HSD did not secure the relocation of the cable. They did, however, move the Ginger Creek alignment to the south of the creek. This new alignment ran across property belonging to the Oak Brook Park District. On March 3, 1975, Pearson, the HSD's engineer, instructed Kenny to begin work along the new Ginger Creek alignment. Kenny dispatched an operator and bulldozer and commenced work. Shortly after work began, the Oak Brook police ordered Kenny to stop work, leave the site, and repair all damage. As it developed, the HSD had no easement or informal permission from the Oak Brook Park District to install the sewer on that property.

Subsequent revisions did not alleviate the necessity of additional costs, costs which the HSD was unwilling to assume notwithstanding the contract Addendum concerning "changed circumstances."

In light of both the HSD's refusal to approve of a new alignment with the accompanying additional costs, and the HSD's refusal to make progress payments, Kenny pulled off the job on April 2, 1975.

Following the trial, the jury returned a verdict for Kenny on their complaint and on the HSD's counterclaim. In their response to three special interrogatories, the jury expressed their belief that the HSD's failure to make progress payments was in violation of the contract and that the HSD had failed to provide a right of way along Jorie Boulevard and Ginger Creek.

The HSD's first contention is that it did not refuse to make monthly payments to Kenny in accordance with the contract. At trial the HSD contended that progress payments were to be made on the basis of a particular method and that Kenny's failure to make requests for progress payments pursuant to this method justified their failure to make the payments.

The trial court found that the contract was ambiguous as to the proper method of computing the amount of progress payments due and, having made this finding, the court admitted parol evidence on the issue. On appeal, the HSD contends that there was no ambiguity and that therefore, the admission of extrinsic evidence was error.

■■ ■ Whether an ambiguity exists in a contract is to be determined by the court as a question of law. (*Bertlee Co. v. Illinois Publishing & Printing Co.* (1943), 320 Ill. App. 490, 52 N.E.2d 47.) Where a contract provision is found to be ambiguous, extrinsic evidence is admissible to aid the jury in reaching a proper interpretation. See *Stanley v. Chastek* (1962), 34 Ill. App. 2d 220, 180 N.E.2d 512.

In this case, Kenny submitted a document entitled "Schedule of

Prices" when bidding on the Phase V project. Kenny's bid proposal broke the project down into unit costs which were added up and divided by the total footage to be excavated. The resulting figure reflected the cost per lineal foot to complete the project.

General Condition 1—4 of the contract was also entitled "Schedule of Prices." That provision stated that a "schedule of prices" was to be submitted to the project engineer prior to the first payment under the contract. This schedule, which was to be used as the basis for payments, was subject to change by the project engineer.

The HSD contends that the contract provision entitled "Schedule of Prices" incorporated Kenny's bid proposal bearing the same title. The HSD concludes that because the bid proposal contains a price per lineal foot for "pipe in place," this was the basis upon which the HSD was bound to make progress payments.

Kenny asserts that the use of the phrase "schedule of prices" in the two independently drafted documents was a mere coincidence. Kenny notes that the contract provision allows the engineer to alter the prices submitted whereas no such allowance is made in the bid proposal. Kenny also cites Article III of the contract which provides for partial payment for "work actually performed." Finally, Kenny asserts that the HSD's interpretation leads to the absurd result that the contract required Kenny to resubmit a document which the HSD already had before it.

■ The trial court, after hearing argument from both sides, ruled that the provision concerning progress payments was patently ambiguous. The court thus permitted extrinsic evidence including evidence of custom and usage in the construction industry. We find that the trial court properly determined as a matter of law that the contract was ambiguous and its admission of extrinsic evidence to explain the terms of the contract was therefore proper.

■ The extrinsic evidence revealed that it was an accepted practice in the construction industry to make progress payments on the basis of work completed rather than pipe-in-place. Other evidence revealed that Lindley, the project engineer, and the EPA (which was financing 75% of the project) had approved payments computed on the basis of work completed. The jury found that Kenny was entitled to be paid for work actually completed rather than for pipe in place. Based on the record before us, we find that jury's verdict was not against the manifest weight of the evidence.

The HSD next contends that they were justified in refusing to pay Kenny's payment requests for two reasons. First, because Kenny's proposed method of payment was not timely and second, because the

HSD never approved the proposed payment method.

The HSD noted that under General Provision 1–4, Kenny was to submit a "Schedule of Prices" prior to the first payment under the contract. Since the original pay request was submitted under the pipe-in-place format, the HSD claims that they were not obliged to pay on any other basis. Although the first pay request was ostensibly based on the pipe-in-place method, evidence at trial revealed that it in fact was based on the "work completed" method.

Just prior to the first pay request, Kenny's engineer (Pat Kenny) met with the project engineer (Lindley) and the HSD's engineer (Pearson) to discuss the method of computing payments. But because the HSD's board was meeting shortly, Lindley and Pearson suggested postponing their discussion and submitting the first pay request in pipe-in-place format so Kenny could receive some payment for the first month's work. Kenny submitted its request on this basis but it was returned due to a technical defect. Upon returning the pay request, the HSD suggested that Kenny resubmit their request in two weeks and include expenses for that two-week period. Just before the two weeks had elapsed, Kenny's engineer again met with Lindley and Pearson to discuss progress payments. Lindley and Pearson agreed that Kenny was entitled to be paid for more than merely pipe in place. Kenny then submitted a pay request based on 991 feet of pipe in place though only 515 feet of pipe were actually in place. Lindley and Pearson endorsed this request, as the contract required, and the HSD made the payment.

Before the next pay request was submitted, Zelasko, Kenny's vice-president, devised a method of computing progress payments which would provide reimbursement for work actually performed while keeping the total payments within the contract price. This method was used in making Kenny's next request and that request was endorsed by Lindley and Pearson. The HSD refused to make any payment based on this method of computation. The HSD did ultimately make one payment in response to Kenny's threat to leave the job but no payments were made thereafter.

As has been previously noted, there was evidence at trial indicating that Kenny's first payment request, though formally based on the pipe-in-place method, was actually based on work completed. Further, the request was submitted in the pipe-in-place format at the suggestion of the project engineer and the HSD's engineer.

It would seem unreasonable to bind Kenny to the pipe-in-place method when none of the requests were actually based on that method and that format was initially used only at the urging of the

HSD's agents.

■ The HSD also contends that they were not bound to pay on a basis other than pipe-in-place because they never approved Kenny's proposed method. Article III of the contract provides that no progress payments shall be made unless approved by the owner. This provision gave the HSD a great deal of discretion; however, contractual discretion may only be exercised in good faith. See *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 28-29, 421 N.E.2d 1375.

The evidence revealed that before pipe is actually "put in place," a great deal of preparatory work takes place. Dewatering shafts must be dug, the job site must be dewatered, trenches and shafts must be dug and rib and lagging put in place prior to laying any pipe. If contractors were paid only for "pipe in place," they would be required to carry a great deal of the initial construction expense. For this reason, it is customary in the construction industry that progress payments be made on the basis of work actually completed. This is the method by which Kenny computed its pay requests. The method was reasonable because it compensated Kenny only for work actually performed. Further, this method was approved by the project engineer, the HSD's engineer, and the EPA. Under these circumstances, the HSD's refusal to approve the new pay proposal was ineffectual.

■ We hold that the HSD's failure to make progress payments constituted a material breach of the contract entitling Kenny to sue for lost profits. (See *Watson v. Auburn Iron Works, Inc.* (1974), 23 Ill. App. 3d 265, 270-71, 318 N.E.2d 508.) Therefore, we need not consider whether the HSD's failure to provide a right of way along Jorie Boulevard and Ginger Creek was also a material breach.

The HSD next contends that the trial court erred in not permitting the jury to determine whether Kenny had elected to rescind the contract rather than sue under it for damages. This contention is based solely on a letter from Kenny to the HSD on April 2, 1975, stating that Kenny considered the contract between them "terminated and rescinded." Kenny made no other statements and took no other actions indicating an intention to pursue the remedy of rescission and *quantum meruit*. The HSD claims that the jury should have been permitted to determine if this statement by Kenny constituted an election to recover under *quantum meruit*.

■ ■ In Illinois, the formal doctrine of election of remedies is confined to cases where (1) double compensation is threatened, (2) defendant has actually been misled by plaintiff's conduct, or (3) *res judicata* can be applied. (*Faber, Coe & Gregg, Inc. v. First National*

*Bank* (1969) 107 Ill. App. 2d 204, 211, 246 N.E.2d 96; see *District 141, International Association of Machinists v. Industrial Com.* (1980), 79 Ill. 2d 544, 550-51; *Casati v. Aero Marine Management Co.* (1980), 90 Ill. App. 3d 530, 536-37, 413 N.E.2d 122.) Under the facts of this case, none of the circumstances giving rise to an election of remedies exist. We hold that the trial court properly refused to submit to the jury the question of whether Kenny had elected to rescind the contract.

■ The HSD also contends that the trial court erred in two respects as to their treatment of Lindley, the project engineer. The court permitted Kenny to examine Lindley as a hostile witness under section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1979, ch. 110, par. 60, superseded without change in substance, Ill. Rev. Stat. 1981, ch. 110, sec. 2—1102.) It also instructed the jury that Lindley should be considered as the HSD's agent for all purposes. The HSD fails to show any prejudice resulting from these alleged errors. It is the duty of the party asserting error to demonstrate that prejudice resulted. (*In re Estate of Weisberg* (1978), 62 Ill. App. 3d 578, 586, 378 N.E.2d 1152.) The reviewing court is not required to search the record for prejudicial error; the party complaining should point out, specifically, the manner in which they were prejudiced. (62 Ill. App. 3d 578, 586.) Here, defendant has failed to designate specifically how it was prejudiced by the trial court's section 60 ruling and instruction to the jury. For this reason, we need not consider this issue. See *Gatto v. Curtis* (1972), 6 Ill. App. 3d 714, 733-34, 286 N.E.2d 541.

The HSD next contends that the jury's damage award was erroneous. Their objections on this point are twofold. First, the HSD claims that Kenny's argument to the jury on the issue of damages was error, and second, the HSD claims that Kenny failed to meet its burden of proving damages.

Initially, the HSD cites as error Kenny's failure to follow the damage instruction in its closing argument. The court's damage instruction provided:

"If you decide for Kenny on its complaint, then you must fix the amount of money which will reasonably and fairly compensate it for the following measure of damages: the entire contract price, less the amount of the progress payments actually paid, and less the cost of completion that Kenny could have reasonably saved by not completing the work."

Kenny's counsel stated in his closing argument that Kenny's damages could be computed by first adding their profit margin as bid to their costs and then by subtracting both payments made and miscella-

neous unanticipated future costs.

The HSD contends that Kenny, by failing to follow the trial court's damage formula, confused the jury on the issue of cost of completion. The HSD failed to object to Kenny's argument and Kenny asserts that any objection has been waived.

■ It is true that a failure to object to alleged errors in an opponent's closing argument is considered a waiver of objection. (*Lindroth v. Walgreen Co.* (1950), 407 Ill. 121, 136; *Chloupek v. Jordan* (1977), 49 Ill. App. 3d 809, 817, 364 N.E.2d 650.) However, even if prejudicial closing arguments are made without objection, a reviewing court may consider assignments of error to the extent that those prejudicial statements prevent a fair trial. *City of Quincy v. V. E. Best Plumbing & Heating Supply Co.* (1959), 17 Ill. 2d 570, 577.

■ In *Smilgis v. City of Chicago* (1981), 97 Ill. App. 3d 1127, 1131, 423 N.E.2d 1288, we held that "[w]here it is apparent the jury has misunderstood or disregarded the evidence or instructions of the court, the court will, upon a failure to do substantial justice, set aside the verdict and grant a new trial." We also held that a failure to object to the alleged cause of the confusion did not preclude us from considering the impact of the jury's confusion.

In the instant case, the jury, during deliberations, passed a note to the judge stating:

"Your Honor, we need clarification of your instructions. What is meant by quote 'less the cost of completion that Kenny could have reasonably saved by not completing the work' end quotes. We are confused as to the method to be used to arrive at this figure. Is there documentation available to guide us to arrive at this figure? If so, can it be made available to us; for example, the blackboard calculations which both Hinsdale Sanitary District and Kenny made during trial?"

The trial judge replied that "cost of completion" means the additional amount of money it would have cost Kenny to complete the work required by the contract. The jury was also told that they would receive no additional exhibits.

■ It is apparent that the jury was confused as to a fundamental element of damages and that this confusion is fairly attributable to Kenny's failure to adhere to the court's damage formulation. We hold, therefore, that the jury's award of damages should be set aside and a new trial granted on the issue of damages.

The HSD also contends that Kenny failed to meet its burden of proving lost profits. The general rule is that while lost profits need not be proven to a mathematical certainty, the plaintiff must show a

reasonable basis for their computation. *Hemken v. First National Bank* (1979), 76 Ill. App. 3d 23, 27, 394 N.E.2d 868.

In the instant case, Mr. Zelasko, Kenny's vice-president, testified regarding lost profits. He testified that Kenny's anticipated profit on its bid proposal was $465,497 and that if the HSD had not breached their contract, Kenny would have completed the project within the contract price. This testimony fails to directly address the issue of how much it would cost Kenny to complete the project at the time of the HSD's breach.

Kenny also produced several evidentiary exhibits from which, it asserts, a cost of completion could be extracted. These exhibits are fairly technical documents which neither provide a method for determining the cost of completion or indicate precisely how much of the project remained to be completed as of April 2, 1975, when Kenny walked off the job.

Kenny asserts that Zelasko's testimony, together with the exhibits, provided the jury with a reasonable basis for computing lost profits. But the profit figure which was testified to by Zelasko, contained in the exhibits and set out in Kenny's closing argument, was the profit margin projected by Kenny at the outset of the project. By using a profit figure which was projected before any work had begun, Kenny failed to go through the necessary process of calculating their cost of completion under the circumstances which existed at the time of the breach. (See 5 Corbin, Contracts sec. 1094, at 510 (1964).) Calculating lost profits in this way puts the plaintiff in the position he would have been in had the contract been fully performed. If, prior to the breach, plaintiff's work was progressing more smoothly than anticipated and below projected costs, the cost of completion at the time of breach would reflect his saving and provide plaintiff with an appropriate profit margin above the original projection. If plaintiff was exceeding its projected costs and would not be able to perform the contract as bid, the cost of completion would reflect those cost over-runs and prevent plaintiff from collecting "lost profits" which would not have been realized had the contract been fully performed.

In presenting their damage argument to the jury, the profit figure Kenny used should have been one "that [they could] prove with reasonable certainty would have been realized by full performance." (5 Corbin, Contracts sec. 1094, at 511-12 (1964).) *Kenny* cites *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, *cert. denied* (1975), 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398, for the proposition that when a breach prevents an exact calculation of lost profits, they may be proved through estimates. (58 Ill. 2d 289, 310-11.) *Vendo* and the cases cited

therein are inapposite to the instant case. Those cases involved situations in which defendants' actions prevented or inhibited plaintiffs' ability to make future sales. The plaintiffs in those cases, in proving their damages, were put in the position of having to prove their future sales volume, a speculative task at best. Under the circumstances in those cases, the trial courts permitted lost profits to be proved through estimates because of the difficulty of proof which was a result of defendants' actions.

No such difficulty of proof is presented here. Kenny's familiarity with the Phase V project made Kenny qualified to make a realistic projection as to the amount of work that remained to be completed. Kenny also possessed some expertise with respect to the Phase V project exhibits. This expertise could have and should have been used to provide the jury with a reasonable basis for awarding lost profits. Indeed, several of the exhibits revealed Kenny's ability to project their anticipated costs for the entire project. Kenny's burden with respect to damages included providing the jury with similar calculations for the remainder of the project. In providing such calculations, Kenny would not be required to project their costs with exactitude. The law requires only that a party claiming lost profits provide the jury with a reasonable basis for granting them. (See *Ashe v. Sunshine Broadcasting Corp.* (1980), 90 Ill. App. 3d 97, 101, 412 N.E.2d 1142.) It is Kenny that had the burden of proving their lost profits and, given their expertise in the construction industry and their familiarity with the Phase V project, it was their duty to present to the jury, in an understandable manner, the basis for their claimed lost profits.

For the reasons stated herein, the judgment of the circuit court is affirmed except as to damages. That portion of the judgment awarding damages is reversed and remanded with directions to conduct a new trial on the issue of damages only.

Reversed and remanded with directions.

DOWNING and HARTMAN, JJ., concur.