755 F.2d 87
 40 UCC Rep.Serv. 387
 CONTINENTAL SAND & GRAVEL, INC., an Illinois corporation,
Plaintiff-Counterdefendant-Appellee,
v.
K & K SAND & GRAVEL, INC., an Indiana corporation, Curtis
Kamminga, and Shirley Kamminga,
Defendants-Counterplaintiffs-Appellants.
CONTINENTAL SAND & GRAVEL, INC., an Illinois corporation,
Plaintiff-Counterdefendant-Appellant,
v.
K & K SAND & GRAVEL, INC., an Indiana corporation, Curtis
Kamminga, and Shirley Kamminga,
Defendants-Counterplaintiffs-Appellees.
 Nos. 83-2923, 83-2012.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 16, 1984.
Decided Feb. 1, 1985.
As Amended Feb. 4, 1985.
 
 Robert K. Blain, Altheimer & Gray, Chicago, Ill., for plaintiff-counterdefendant-appellee.
 Alvin W. DeJong, Chicago, Ill., for defendants-counterplaintiffs-appellants.
 Before BAUER and CUDAHY, Circuit Judges, and DOYLE, Senior District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 Plaintiff Continental Sand & Gravel Inc. ("Continental") sued for breach of express warranties made by defendants K & K Sand & Gravel, Inc. and Kurt and Shirley Kamminga in a written agreement for the sale of certain real and personal property. The defendants counterclaimed for the balance due on a related consulting agreement. At issue in this appeal are the trial court's determinations regarding the defendants' breach of various warranties, the appropriate measure of damages and the plaintiff's liability under the consulting agreement. We affirm the judgment of the district court and remand for consideration of attorneys' fees.
 
 I.
 
 2
 The defendants owned and operated a sand and gravel pit near Demotte, Indiana. In 1979, they agreed to sell the pit, together with various inventory and mobile equipment, to plaintiff Continental's parent company, which assigned all its rights under the agreement to Continental. After initial negotiations between the parties, Continental offered to purchase the defendants' assets for a total price of $650,000, which consisted of $320,000 for real estate and inventory, $280,000 for plant equipment, and $50,000 for mobile equipment. The final agreement was the same, except that the purchase price for the plant equipment was reduced to $80,000 from $280,000 and, to offset this, a consulting agreement was added under which Continental would pay defendants $60,000 per year for four years.
 
 
 3
 The mobile equipment, which was sold for $50,000, consisted of a 120B pay front-loader, a 120C pay front-loader, two cranes, a truck, a tractor, a trailer and a dredging barge. The defendants made various express warranties in the agreement, including that "the Purchased Assets are all in good order, condition and repair" and that "[t]here are no defects in the Purchased Assets which would materially affect the use thereof for the purpose for which the Purchased Assets are now used."
 
 
 4
 Continental purchased the sand and gravel business in March of 1979. Soon thereafter, when Continental began operations, one of its employees found that the mobile equipment was in poor repair and had been poorly maintained. In April, Continental's president visited the operation, and then wrote to one of the defendants, Mr. Kamminga, stating that the equipment was in poor condition. Between March and June 26, 1979, Continental incurred repair bills totaling more than $23,000. On June 26, a federal inspector found that one of the cranes was unsafe to operate, and shut production down. The plaintiff then rented a replacement crane and used it throughout the summer. In July, Continental wrote to defendants that in light of the poor condition of the mobile equipment, it believed the warranties pertaining to the equipment had been breached. It also submitted repair estimates on certain pieces of equipment, which totaled about $164,000.
 
 
 5
 The defendants apparently did not respond to Continental's letters. Continental subsequently decided to change its basic dredging operation rather than expend more money on repairing the equipment. Continental bought equipment that allowed it to pump sand and gravel out of the lake bed rather than digging the material out, and began the new operation in the spring of 1980. Also, based on its belief that defendants had breached the warranties pertaining to the mobile equipment, Continental refused to pay the $240,000 balance due to defendants under the Consulting Agreement.II.
 
 
 6
 The first set of issues involved in this appeal relates to whether defendants breached the warranties they made with respect to the condition of the mobile equipment. The district court found that during the first three months of operation, most of the mobile equipment was in working condition, but that certain pieces of equipment did not conform to the warranty that the equipment was in good condition and repair. In particular, the court found that the warranty was breached with respect to the dredging barge, which had been submerged in water and inoperable for several years, and the crane, which had been condemned by the federal inspector in June of 1979. The court also found that the warranty was breached as to the 120B pay loader.
 
 
 7
 The defendants contend that the lower court's finding that the warranties were breached was clearly erroneous because the evidence indicated that the equipment met the trade usage definition of equipment in "good" condition. The defendants placed in evidence a printed document distributed in the heavy equipment industry which they assert established that the trade usage definition of "good" equipment is that the equipment must be: "[i]n operating condition. However, may have some worn parts that require repairing or replacing soon. No known mechanical defects except any that may be described." Defendants claim that this definition was clearly met as to the crane and the pay loaders, since witnesses testifying about the condition of each responded affirmatively when asked whether those pieces of equipment were in operating condition, though they may have had worn parts that required repairing or replacing soon. In addition, defendants argue that most of the equipment clearly met the warranties since the equipment functioned during the first three months of the plaintiff's operation.
 
 
 8
 The district court's opinion does not indicate whether the court accepted defendants' proposed trade usage definitions of "good," "fair," etc. as controlling. We do not find this question particularly important, however, in light of the fact that the court expressly decided that the warranties made here were far broader than the mere representation that the equipment was in good condition and repair as of the date of sale; rather, the warranties extended beyond the date of purchase, and taken together were clearly intended to guarantee the continued operation of the sand and gravel equipment for an indefinite period. Thus, even if it were established that the equipment met the trade definition of "good" at the time of sale this fact alone would not demonstrate that the warranties were not breached.[1] The trial court carefully considered the language of the warranties as well as the used condition of the equipment in interpreting the warranties.[2] Moreover, the court extensively discussed conflicts in the evidence relating to the condition of each piece of equipment on the date of purchase, the length of time it remained operational if it ever was, and the cost of repairing it, as well as the amount of sand and gravel that the plaintiff was actually able to produce with the defective equipment. We find no error in the court's determination that the warranties were breached with regard to the 120B pay loader and other equipment.[3]
 
 III.
 
 9
 The parties also assert various errors in the district court's computation of damages. The court used a repair cost formula in computing plaintiff's damages, and awarded $104,206.75, the cost of repairs that it found were necessary to bring the 120B pay loader, the crane and the dredging barge up to the warranted condition. The court refused to award consequential damages representing the plaintiff's lost profits, however, stating that the evidence as to lost profits was too speculative.
 
 
 10
 Defendants argue that, since the clear bargain of the parties was to sell and purchase the mobile equipment for $50,000, the plaintiff is only entitled to receive an amount of damages that represents the diminution in value from the purchase price as the result of the breach of warranty. In other words, defendants contend that the maximum amount of recoverable damages is the difference between the fair market value of the equipment as accepted, which they define as $50,000, and the fair market value of the equipment in the defective condition. Under this method of computing damages, Continental would be entitled to recover no more than the $50,000 purchase price, and as little as nothing, depending on the court's assessment of the value of the equipment in the defective condition.[4]
 
 
 11
 The court below rejected this argument, and instead applied section 2-714(2) of the Illinois Uniform Commercial Code, ILL.REV.STAT., ch. 26, which provides that damages generally should represent the difference between the value of the goods at the time of acceptance and the value they would have had if they had been as warranted. The court stated that under this section the cost of repair is the proper standard. This was the correct approach under Illinois law, as well as under the general commercial law. Midland Supply Co. v. Ehret Plumbing & Heating Co., 108 Ill.App.3d 1120, 64 Ill.Dec. 601, 440 N.E.2d 153 (5th Dist.1982); Griese v. Cory Pools, Ltd., 58 Ill.App.3d 256, 15 Ill.Dec. 699, 373 N.E.2d 1383 (2d Dist.1978). As the district court noted, it is not unusual for damages in a breach of warranty case to exceed the purchase price of the goods. See Chatlos Systems, Inc. v. National Cash Register Corp., 670 F.2d 1304, 1306 (3d Cir.), cert. dis., 457 U.S. 1112, 102 S.Ct. 2918, 73 L.Ed.2d 1323 (1982). This result is logical, since to limit recoverable damages by the purchase price, as defendants suggest, would clearly deprive the purchaser of the benefit of its bargain in cases in which the value of the goods as warranted exceeds that price. Thus we find that the district court properly computed the damages recoverable for the defendants' breach of the warranties.[5]
 
 
 12
 Continental finds no fault with the court's award of repair costs as damages for the breach of warranties, but contends that the court erred in refusing to award it consequential damages consisting of its lost profits as well. The district court concluded that proof of lost profits was too speculative since it could not determine the amount of sand that Continental actually processed, a figure that must be compared to the amount that should have been processed if the mobile equipment had been as warranted.
 
 
 13
 The evidence as to the amount of production conflicted. Continental's president testified that only 20,000 tons of sand and gravel were excavated during the 1979-80 season, but the court explicitly rejected this testimony. Defendants' evidence indicated that as much as 30,000 tons of processed sand had been stockpiled during the season. Also, a crane operator testified that about 50,000 tons were processed, and one of the defendants testified that Continental was selling sand to customers in a normal fashion throughout the summer. Lost profits must be proven with reasonable certainty. F.E. Holmes & Son Const. Co. v. Gualdoni Elec., 105 Ill.App.3d 1135, 61 Ill.Dec. 883, 435 N.E.2d 724 (5th Dist.1982). While exact precision is not required, it is the plaintiff's burden to prove lost profits by evidence that provides a reasonable basis for assessing damages. Kenny Const. Co. v. Hinsdale Sanitary District, 111 Ill.App.3d 690, 67 Ill.Dec. 274, 444 N.E.2d 510 (1st Dist.1982). We find no error in the court's determination that Continental failed to do so.[6]
 
 IV.
 
 14
 Continental's final contention is that the lower court erred as a matter of law in awarding defendants judgment on their counterclaim. In the counterclaim defendants alleged that Continental breached the consulting agreement by refusing to pay to defendants the $60,000 per year for four years that it owed under that agreement. Finding that Continental had neither alleged nor proved any breach of the consulting agreement, the district court found in favor of defendants on the counterclaim.
 
 
 15
 Continental argues that this was error, because contrary to the implication in the district court's opinion, the consulting agreement and the purchase of defendants' assets were all part of a single inseparable transaction and contract. Therefore, says Continental, the breach of the equipment warranties constituted a breach of the entire agreement and it was entitled to suspend its own performance (payment on the consulting agreement) and sue for damages. Because defendants' position that the warranties had not been breached made their promise to be available for consultation useless, Continental contends, it should not have to pay for amounts due under the consulting agreement. Defendants did not address this issue in their brief, but at oral argument defendants' attorney acknowledged that the consulting agreement was really part of the same transaction as the sale of defendants' assets and that in substance the payments due on the consulting agreement were part of the purchase price.
 
 
 16
 Although it appears that the consulting agreement was an integral part of the total contract, it does not matter for purposes of this analysis whether the consulting agreement was a separate agreement or was part of the overall agreement to sell the assets. If the consulting agreement was a separate transaction, then the district court's finding that plaintiff had not shown any breach of the consulting contract, not clearly erroneous,[7] means that plaintiff is fully obligated to pay for the consulting services. In that case, the district court's judgment for the defendants on their counterclaim was correct. If, on the other hand, as seems much more likely given the course of negotiations between the parties, the payments due under the consulting agreement really represent part of the purchase price for defendants' assets, the plaintiff is still responsible for these payments. A party may not invoke (or at least may not be granted) a remedy based on affirmance of a contract, such as a suit for damages for breach of the contract, and also a remedy based on disaffirmance, such as rescission. See Bruno Benedetti & Sons, Inc. v. O'Malley, 124 Ill.App.3d 500, 79 Ill.Dec. 694, 464 N.E.2d 292 (2d Dist.1984); Perino v. Protect-All-Shelters, Inc., 128 Ill.App.2d 477, 262 N.E.2d 349 (3d Dist.1970); Morey v. Huston, 85 Ill.App.2d 195, 228 N.E.2d 544 (4th Dist.1967). Here, plaintiff has not sought to rescind the contract and so escape its duties under the contract. Rather, it has sued for damages. It remains fully responsible for the purchase price of defendants' assets, less only an amount representing damages for defendants' breach of the warranties. This is exactly the result reached by the district court's award to plaintiff of damages for defendants' breach of the warranties and award to defendant of the amounts due under the consulting agreement, and we find no error in the outcome.
 
 
 17
 The final issue involved in this appeal relates to interest. Defendants assert that the trial court should have awarded them statutory interest under ILL.REV.STAT. ch. 17, section 6402 on the amount of the counterclaim. That section provides in part that creditors shall be allowed to receive 5% interest on all monies after they become due on any instrument of writing. Defendants contend they are thus entitled to 5% interest per annum on the "unpaid installments of the purchase price" (apparently the amounts due under the consulting agreement). The district court did not discuss this issue in its opinion, but we think it did not err in refusing to award statutory interest. Apparently this statutory provision for interest is only applicable where a liquidated sum is due unilaterally and is not conditioned on future performance, such as on rendition of the consulting services or on delivery of the equipment in good condition as warranted here. Grandview Development Co. v. Finley Enterprises, Inc., 46 Ill.App.3d 848, 853, 5 Ill.Dec. 166, 170, 361 N.E.2d 305, 309 (3d Dist.1977). Further, the decision whether to award or deny interest as an element of recoverable damages according to the equities of the case is a matter committed to the trial court's discretion. Emmenegger Const. Co. v. King, 103 Ill.App.3d 423, 59 Ill.Dec. 237, 431 N.E.2d 738 (5th Cir.1981). Nothing suggests that the district court abused that discretion in this case.
 
 
 18
 For the foregoing reasons we affirm the district court's judgment with respect to liability and damages. Continental, however, contends that it is entitled to attorneys' fees under its contract with defendants, a matter that the district court stated it would consider after the disposition of the case on appeal. We therefore remand as to that branch of the case so that it may do so.
 
 
 
 *
 The Honorable James E. Doyle, Senior District Judge for the Western District of Wisconsin, is sitting by designation
 
 
 [1]
 Moreover, in questioning the witnesses about whether the equipment met the trade definition, defendants' attorney quoted only part of the definition of "good," leaving out the part of the definition that states that good equipment has "no known mechanical defects except any that may be described." Thus defendants did not effectively demonstrate even that the equipment met their proposed definition
 
 
 [2]
 Defendants insist that the court erred in refusing to apply the "basis of the bargain" rule in the Illinois Uniform Commercial Code, ILL.REV.STAT., ch. 26, Sec. 2-313, to interpret the warranties. As the district court noted, however, section 2-313, which provides that certain affirmations of fact or descriptions of goods made by a seller become part of the basis of the bargain between seller and buyer, clearly relates to the creation of express warranties, and is used to determine whether such descriptions are material and should be given legal effect as warranties. Alan Wood Steel Co. v. Capital Equipment Enterprises, Inc., 39 Ill.App.3d 48, 349 N.E.2d 627 (1st Dist.1976). The rule is not relevant to the problem presented here, in which the warranties made were clear and express, there is no question of materiality and the only issue is whether they were breached. Moreover, defendants' purpose in invoking the basis of the bargain rule apparently is to limit the scope of the warranties made by incorporating the understanding that the equipment was used. Yet this result was already achieved: the district court made it clear that it considered the fact that the equipment was used at the time of sale in determining the scope of the warranties
 
 
 [3]
 For these same reasons we reject plaintiff's contention that the district court's finding that the warranty was not breached with respect to the 120C pay loader was clearly erroneous. Although the evidence conflicted as to the condition of this machine, defendants' expert, Mr. Metz, testified that the 120C pay loader was in "good" and "fair to good" condition. The court was entitled to find from this and other testimony that this pay loader conformed to the warranties
 
 
 [4]
 Defendants cite Soo Line Ry. v. Fruehoff Corp., 547 F.2d 1365 (8th Cir.1977), to support their argument. In that case the district court had instructed the jury in part that the total amount of damages could not exceed the difference between the fair market value of an item as accepted and the fair market value of the item in the defective condition, and the appellate court quoted this instruction in its opinion before affirming the district court's judgment. Nevertheless, the remainder of the instructions made it clear that that this limitation on damages is only applicable when repairs do not bring the warranted items up to their value as warranted, and in other circumstances the cost of repairs is the proper measure of damages. In any event, the court stated that the proper measure of damages under Minnesota law was the difference between the actual value of goods at the time of acceptance and the value they would have had if they had been as warranted. Id. at 1377-78. This was the measure of damages applied by the district court here
 
 
 [5]
 Defendants' other attacks on the district court's computation of damages for their breach of warranties are without merit. Defendants contend among other things that the court erred in awarding damages when the plaintiff failed to "cover" under Illinois Uniform Commercial Code, ILL.REV.STAT., ch. 26, Sec. 2-712. Apparently defendants refer to the fact that plaintiff did not actually make the repairs necessary to bring the mobile equipment up to the warranted condition, but rather changed over to a different type of operation. As the court below noted (although the point is legally irrelevant), the cost of changing the operation was about the same as the cost of repairing the equipment. More important, the concept of "cover" applies in situations in which the seller fails to deliver goods, or the buyer rightfully rejects or justifiably revokes acceptance of the goods, Illinois Uniform Commercial Code, ILL.REV.STAT., ch. 26, Sec. 2-711, none of which occurred here. And, generally, damages based on cost of repair are recoverable regardless whether the repairs are actually undertaken. Presumably, if the repairs are not made, the potential market value of the goods is reduced by an amount equivalent to the value which would have been added by repair
 
 
 [6]
 Continental also complains that the court refused to admit certain of its sales records which would have established production with reasonable certainty by showing that it sold about 30,000 tons of material from 1979 production. The court noted in its opinion that it had made clear throughout the trial that such records could be important to the plaintiff's case, but Continental had not seen fit to list them in the pre-trial order or offer them as evidence until, in response to the court's questioning at the end of the defendants' case, plaintiff offered them as rebuttal evidence. The decision whether to allow plaintiff to reopen its case in chief after the close of defendant's evidence was a matter within the trial court's discretion. Nanda v. Ford Motor Co., 509 F.2d 213, 223 (7th Cir.1974). Whether plaintiff's delay in offering the records was the result of a tactical decision or an oversight, we think the district court did not abuse its discretion in refusing to consider them when they were belatedly offered
 
 
 [7]
 Continental's bare allegation on appeal that the defendants' denial of any breach of the equipment warranties made their promise to provide consulting services useless is contradicted by defendants' assertion that they stood ready to provide such services. In any event, such a contention is insufficient at this stage to show that the consulting agreement was in fact breached