124 F.3d 203
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
COLEMAN CABLE SYSTEMS, INCORPORATED, Plaintiff-Appellant,
v.
SHELL OIL COMPANY, a Delaware corporation, Defendant-Appellee.
 Nos. 96-3445, 96-3600.
 United States Court of Appeals, Seventh Circuit.
 Argued April 23, 1997.
Decided Sept. 17, 1997.
 
 Before BAUER, RIPPLE, and MANION, Circuit Judges.
 
 ORDER
 
 1
 Coleman Cable Systems manufactured electric cable with insulation made, in part, from a compound produced by Shell Oil Company. When the electric cable failed because of chemical incompatibility between the Shell product and the rest of the insulating sheathing, Coleman sued Shell in diversity for breach of warranty and fraud. The district court entered summary judgment for Shell. We affirm.
 
 I.
 
 2
 This case involves a technically complex interaction between two compounds commonly known as plastic or rubber. Coleman Cable Systems manufactures industrial electrical cable. The process includes sheathing metal wire or cable conductors with various materials that insulate and "jacket" the conductor (the jacket is the outer layer of material designed to protect the inner layer of insulation which in turn surrounds the wire or cable conductor). In the past, Coleman had insulated certain of its industrial electrical cables with two compounds purchased from Uniroyal. Shell manufactures and sells petroleum based products such as synthetic rubbers. These include a number of synthetic rubber compounds known as thermoplastic elastomers which are sold under the trade name Elexar. One of those elastomers, Elexar 8451, is at issue here. Shell successfully convinced Coleman that it could substitute Elexar 8451 for the two compounds it previously had purchased from Uniroyal. Beginning in 1982, and carrying on through 1991, Coleman purchased Elexar 8451 from Shell.
 
 
 3
 Around the time when it switched over to the Shell product, Coleman designed and began to produce an electric cable that contained a copper wire conductor, an Elexar 8451 insulating layer, and an outer jacket made of Garaprene/NS308. Garaprene, manufactured by Gary Corporation, is a polyvinylchloride (PVC)-based compound containing plasticizers which render the PVC flexible. Coleman claims it used Garaprene/NS308 as an outer jacket because it was more fire resistant than Elexar 8451.
 
 
 4
 As it turned out this was an unfortunate combination: Elexar contains polystyrene end blocks which exert an attractive force on the plasticizers in Garaprene. The plasticizer "migrates" within the Garaprene causing it to break down and become oily or gummy. As a result, Coleman's industrial clients who had purchased and installed this particular electrical cable over a ten-year period, began to experience costly failures for which they sought recovery from Coleman. In turn, Coleman sought to cover its losses by suing Shell for breach of express warranty, breach of implied warranty, and fraud. Shell counterclaimed for money owed to it but withheld by Coleman for purchases of Shell products. The district court dismissed Coleman's express warranty count for failure to state a claim, granted summary judgment for Shell on the implied warranty and fraud claims, and also granted summary judgment for Shell on the counterclaim.
 
 II.
 A. Express Warranty
 
 5
 The district court dismissed count one of Coleman's complaint which alleged breach of express warranty for failure to state a claim. Fed.R.Civ.P. 12(b)(6). We review such a dismissal de novo, accepting as true all factual allegations in the complaint and drawing all reasonable inferences from these facts in favor of the plaintiff Murphy v. Walker, 51 F.3d 714, 717 (7th Cir.1995) (emphasis added).
 
 
 6
 In its breach of express warranty count, Coleman alleged that Shell's brochure for Elexar contained provisions which could reasonably be interpreted as expressly warrantying Elexar 8451 for use as electrical cable insulation. It argues that an express warranty need not be explicit but may be implied from other language.[1] Accepting this proposition, at least for purposes of analysis, the district court determined that implying an express warranty from the language in the brochure would not be reasonable given Shell's explicit warnings in the same brochure that Elexar was incompatible with PVC. One such warning stated: "[d]o not use color concentrates based on a PVC carrier resin because it is incompatible with Shell Elexar rubber." The "it" appears to refer to PVC carrier resin. Another statement warns that it is necessary to clean a particular processing machine, noting it is "particularly important if PVC was previously processed because it is not compatible with Shell Elexar rubber. Without a thorough clean-out, a high incident of spark failure in Shell Elexar rubber coatings will occur due to PVC contamination." A table in the brochure titled "troubleshooting guide" states that a possible cause for one problem with Elexar could be "PVC contamination." These warnings clearly indicate some incompatibility between Elexar and PVC. The question is to what extent they are incompatible.
 
 
 7
 Coleman contends these warnings at most suggest that Elexar and PVC are what Coleman calls "process incompatible," meaning that the products should not be mixed. The statements do not warn, Coleman argues, against "contact incompatibility," by which it means the Elexar and PVC should not come into contact in a finished product. Because Coleman's problem involved contact incompatibility and not process incompatibility, Coleman contends that the statements in the brochure were insufficient to negate the express warranty.
 
 
 8
 Shell argued and the district court concluded that because the warning made no such limitation, "incompatibility" could not be confined to "process incompatibility" but could also mean "contact incompatibility." Although the district court discounted Coleman's argument on the limitations of the warning, the argument does have merit. Taken in context, the warning statements appear more limited than the district court suggests, they seem only to warn of process incompatibility.
 
 
 9
 Nevertheless, even if the brochure is not read to explicitly warn about contact incompatibility, the warning should render a certain caution on Coleman's part with regard to placing Elexar in contact with PVC. This is especially so given the fact that Coleman had similar contact problems between Garaprene/NS308 and a thermoplastic they used prior to Elexar 8451, manufactured by Teknor Apex. With such experience, a reasonable person would not just assume that the two products were contact compatible without inquiring further, especially in light of the warnings.
 
 
 10
 But whether the warnings were confined only to process incompatibility, or whether a reasonable person would be sufficiently warned of contact incompatibility is irrelevant. Coleman's express warranty claim hinges not on whether there was a warning, but on whether there was an express warranty in the first place. Coleman still has not presented any language in the brochure which suggests that the two compounds are compatible. Under Texas law[2] (which has adopted the UCC) an express warranty requires an affirmation of fact or promise relating to goods or a description of the goods which becomes part of the basis of the bargain. Tex. Bus. & Comm.Code § 2.313. "[A]n affirmation merely of the value of goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Id. § 2.313(b). Crosbyton Seed Co. v. Mechura Farms, 875 S.W.2d 353, 361 (Tex.Ct.App.1994) (setting out terms of § 2.313 and describing elements of express warranty). Coleman argues that certain language in the Shell brochure pertaining to Elexar created an express warranty that Elexar was suitable and safe when used in contact with other reasonably expected materials, including PVC with plasticizers. Fifth Amended Complaint at p 38. Specifically, Coleman directs us to the following language from the brochure:
 
 
 11
 Shell Elexar rubber is the trade name for compounds used specifically in the manufacture of wire and cable insulation and jacketing.
 
 
 12
 This brochure was developed to assist processors of Shell ELEXAR rubber ... when extruding wire and cable insulation and jacketing or injection molding electrical plugs and connectors.
 
 
 13
 The wide range of properties, excellent performance and ease of thermoplastic processing of Shell ELEXAR rubber have led to its growing use in a variety of wire and cable applications.
 
 
 14
 We do not read this as a representation that Elexar may be used with PVC. This language only speaks of Elexar's use, generally, as a compound which has a wide range of properties in wire and cable insulating and jacketing applications. There is no dispute that Elexar is a trade name or that it is used in the manufacture of insulation and jacketing. Nor is there dispute about why the brochure was developed. The only passage cited which might approach an express warranty is the third passage which describes Elexar as having a wide range of properties, excellent performance and ease of processing. Yet Coleman does not contend that this statement is not true, only that it is not true for one specific use-for contact use with PVC containing plasticizers. But the passage does not state that it is good for every use and it is silent about any specific uses. Not only does it not warranty Elexar for use with PVC containing plasticizers, it makes no assertions about its compatibility with any other compounds. Nothing we have learned about Elexar's properties undercuts the truth of the statements in Shell's brochure as excerpted for us by Coleman. And the passages not excerpted by Coleman, those containing the warnings about incompatibility with PVC, at a minimum suggest that the positive assertions made in the brochure, however read, are not absolute.
 
 
 15
 The Shell brochure does not create an express warranty. This is not because it contains language warning about incompatibility with PVC as the district court noted. Rather it is because the brochure contains no language that can reasonably be construed as expressly warrantying Elexar for use with PVC or for that matter with any other product. Accordingly, although for reasons different than the district court, we affirm the 12(b)(6) dismissal of the express warranty count. See R.J.R. Services, Inc. v. Aetna Cas. & Sur. Co., 895 F.2d 279, 281 (7th Cir.1989) (affirming dismissal for reason different than that used by district court where face of complaint required dismissal).
 
 B. Implied Warranty
 
 16
 Shell moved for summary judgment on Coleman's implied warranty of fitness claim. The district court ruled for Shell, applying the law of the case doctrine. See Donohoe v. Consolidated Operating & Prod. Corp., 30 F.3d 907, 910 (7th Cir.1994) (when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case). We review issues decided on summary judgment de novo, and resolve all reasonable inferences in favor of the nonmoving party. Colip v. Clare, 26 F.3d 712, 714 (7th Cir.1994).
 
 
 17
 As it had already concluded that Shell expressly warned that Elexar and plasticized PVC were incompatible, the district court refused to infer that Coleman could reasonably have relied on an implied warranty when using the products together. The court's focus was on the reasonableness of any reliance. Additionally, the court noted that even had facts otherwise suggested an implied warranty, Shell had explicitly disavowed any such warranties in the purchase agreements it sent to Coleman.
 
 
 18
 Coleman attempted to buttress its implied warranty argument by rearguing the dismissal of its express warranty claim, specifically citing to an expert affidavit submitted in response to Shell's motion for summary judgment. The expert explained why the Elexar and PVC with plasticizers were chemically incompatible. While this is interesting, it is not relevant to the issue of whether or not Shell warranted the products to be compatible. The expert also explained that process incompatibility was different than contact incompatibility and then went on to suggest that Shell impliedly warrantied Elexar for contact with PVC. The district court refused to consider the testimony because the expert's expertise was in chemistry not in warnings. The court determined it was at least as capable of understanding a warning as was a chemist. Coleman appeals this evidentiary ruling.
 
 
 19
 Whether to admit or exclude expert testimony is left to the discretion of the trial court and its action will be reversed only if "clearly erroneous." Mars v. United States, 25 F.3d 1383, 1384. The district court did not abuse its discretion when it disregarded this "expertise" because, even accepting all of the chemical explanations provided by the expert, his views on the plain meaning of the warranty did not derive from that expertise. Carro v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir.1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.").
 
 
 20
 Because we have concluded that the express warranty claim fails (not because of the presence of a warning but because of the absence of any express warranty), any law of the case below involving the warning cannot control our determination. Instead, we focus on whether or not an implied warranty claim would survive summary judgment, noting that we can affirm the district court's entry of summary judgment on any grounds in the record. Williams v. United States Steel, 70 F.3d 944, 947 (7th Cir.1995).
 
 
 21
 As discussed above, Coleman's express warranty claim was based on an argument that an express warranty could be implied from other language in the brochure. Coleman does not present any language in the brochure that implies, in the general sense of the word, that Elexar and PVC with plasticizers are compatible. For the same reasons the express warranty was not implied, an implied warranty was not implied.
 
 
 22
 An implied warranty requires a showing that a plaintiff (1) purchased goods from the seller; (2) that at the time of the sale the seller had reason to know the particular purpose for which the goods were required; and (3) that the buyer relied on the seller's skill or judgment to select or furnish suitable goods. Tex. Bus. and Comm.Code § 2.315. Sipes v. General Motors Corp., 946 S.W.2d 143, 158 (Tex.Ct.App.1997) (describing elements of implied warranty). At the minimum, Coleman's implied warranty claim falls apart at step two.
 
 
 23
 Coleman suggests that Shell impliedly warrantied Elexar for use with PVC because Shell knew, or had constructive knowledge that Coleman was jacketing Elexar insulated cable with Garaprene/NS308. But there is no evidence that Shell knew that Coleman intended to use the two products in contact with each other. All evidence is to the contrary-that Shell was unaware of Coleman's proprietary manufacturing process. What Coleman alleges is that Shell had the opportunity to be aware of the process because Shell employees had visited and observed Coleman's plant (Coleman essentially implies the Shell employees should have noted the drums of Garaprene lying about), and therefore should have been aware of Coleman's use of Elexar and Garaprene. Shell did, of course, know that Coleman was in the business of manufacturing insulated wire and cables. But Coleman produced more that just the cable at issue here and used different products to insulate and jacket different cables, depending upon the use to which the cables would be put. Coleman has presented us with no evidence that Shell did in fact know of the proprietary process by which, in this particular cable, Garaprene NS308 was jacketing Elexar insulation. In fact there is evidence Coleman intentionally did not tell Shell of the process.
 
 
 24
 Moreover, at oral argument counsel for Coleman, who also had represented Coleman in the district court, explained to us that "my client used this material sold by Shell for a couple of years before a problem developed because of the fortuitous circumstance that my client was sticking a layer of tissue paper in between the Elexar and the PVC [in order to facilitate mechanically stripping the jacket and insulation from the wire]. [O]ur clients began saying, 'Stop using that tissue paper its actually easier to strip without it,' so we stopped using it. That's when the problem began." This explanation of the development of the particular electric cable in question does not help Coleman's cause. Rather it further undermines Coleman's entire implied warranty claim. As noted above, for Coleman to succeed on the implied warranty claim, it had to prove that Shell had reason to know the particular purpose for which it would be using the goods. But even had Shell been fully informed in advance of the proposed construction of the cable (which of course it was not), there would have been reason not to raise an alarm because the Elexar was not in contact with any PVC containing plasticizers-Coleman's manufacturing process separated the Elexar and PVC with tissue. Coleman does not even try to allege Shell should have been aware that Coleman might be changing the way it constructed this particular cable. (There is no indication Shell was aware of the tissue separator in the first place.) And it was only after the changes were made, and the two products were in contact with one another, that the incompatibility became an issue.[3]
 
 
 25
 The district court's entry of summary judgment on the implied warranty claim is affirmed because there is no undisputed issue of material fact which would lead to a conclusion that Shell knew or had reason to know of Coleman's intention to manufacture a cable in which Elexar and Garaprene were in contact. Absent that element, Coleman's implied warranty claim could not succeed.[4]
 
 C. Fraud
 
 26
 Coleman claims Shell misrepresented Elexar's properties when it applied for listing with Underwriters Laboratories, knowing that firms such as Coleman would rely on the UL listing to determine product compatibility. Given the anticipated reliance, Coleman insists the alleged misrepresentation to UL constituted intentional fraud on Coleman. "The elements of fraud are a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." Sears, Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282 (Tex.1994) (quoting DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex.1990)). The district court stated that Coleman's theory lacked the element of intent and reliance. Coleman was not suing UL and UL was not suing Shell. Because there was an intermediary, Coleman could not connect intent and reliance between itself and Shell. The court ruled that one cannot have "secondhand reliance or intent to deceive once-removed."
 
 
 27
 The parties contest the properties of Elexar and PVC and thus they do not agree on whether Shell correctly reported those properties to UL. Coleman has not produced any evidence by which one could reasonably infer that Shell intentionally provided UL with false information. "Actionable fraud requires that the party making the representation do so with the actual intent to cause the other to rely upon the falsity." Eagle Properties, Ltd. v. KPMG Peat Marwick, 912 S.W.2d 825, 827 (Tex.Ct.App.1995). Mere evidence of the provision of false information is not enough, and Coleman presents us with no evidence of intent, instead implying only that a jury could infer intent from the evidence that Shell had provided materially false information regarding Elexar to Underwriters Laboratories. Moreover, even if Coleman could prove that Shell intentionally misled Underwriters Laboratories, that would not be enough to establish the fraud claim as Coleman is not Underwriters Laboratories. Whatever duty Shell had to provide truthful information to Underwriters Laboratories ended there and Coleman, an outsider to any transaction between Shell and Underwriters Laboratories has no legal right to rely on that information. Jefmor, Inc. v. Chicago Title Ins. Co., 839 S.W.2d 161, 164 (Tex.Ct.App.1992) (citing Westcliff Co. v. Wall, 267 S.W.2d 544 (Tex.1954)). Nor can Coleman claim it reasonably relied on what UL reported because UL guidelines themselves do not permit such reliance; those guidelines require Coleman to submit for investigation and classification the finished cable using the two listed compounds. Because Coleman did not comply with UL's procedures it cannot now claim that its reliance was reasonable. Cf. Autry v. Dearman, 933 S.W.2d 182, 189 (Tex.Ct.App.1996) ("Moreover, [appellant] could not have reasonably relied on any alleged representation by [appellee] that he would act on its behalf because it did not obtain the required written agreement and the claimant's consent.").[5]
 
 
 28
 The district court's entry of summary judgment on Coleman's attenuated fraud claim was appropriate. It was even more appropriate given the admission that at the time Coleman began manufacturing this cable the two incompatible products were isolated from each other by a layer of tissue paper. It is too farfetched to propose that Shell intentionally misled Underwriters Laboratories in order to further intentionally mislead Coleman in the event Coleman contemplated removing a layer of tissue from one of their cables sometime in the future.
 
 D. Choice of Law
 
 29
 The parties disagree on whether Texas or Illinois law should control this case. In this case the parties maintain that the choice of law is relevant only to the counterclaim, and then only to the question of attorneys fees and interest on the counterclaim judgment. Other than attorney's fees, no other aspect of the counterclaim judgment is challenged on appeal.
 
 
 30
 While considering Shell's motion for summary judgment on the counterclaim, the district court determined that Texas law controlled the case. The decision was based on the terms of Shell's invoice which set out, inter alia, that Texas law governed. Illinois law would have been more favorable to Coleman and Coleman argues, citing cases and legal authorities, that a federal court sitting in Illinois must apply Illinois-choice-of-laws rules. Shell contends Coleman waived this argument by not raising it in the district court. Coleman denies it waived the issue, citing two pleadings in the voluminous district court record where it argued its Illinois choice of law claim: its response to Shell's motion for summary judgment and its objection to Shell's petition for attorneys' fees.
 
 
 31
 We have examined those pleadings Coleman identified. In its motion for summary judgment Shell contended that by the terms of its contract with Coleman, Texas law governed the case. Shell pointed to a choice of law provision contained on the invoices it sent to Coleman at the time it shipped the Elexar. In its response brief, Coleman asserted only: "Counter Defendant does not concede that the section of the Texas Civil Code cited by Counter Plaintiff is applicable (or even that Texas law governs these transactions)." Coleman provided no argument or law to support this parenthetical statement, nor any factual assertions that would "require the denial of summary judgment." Local General Rule 12(N) (requiring from a party opposing summary judgment, among other things, a supporting memorandum of law and specific references to any additional facts that require the denial of summary judgment).
 
 
 32
 Based on the above mentioned briefs, the district court granted Shell's motion for summary judgment on the counterclaim. The district court determined that Texas law controlled based on the express terms of the invoice, and noted that "[b]ecause Coleman failed to file a 12(N) statement there are no material facts in dispute." This court has consistently "sustained entry of summary judgment where 'the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts.' " Brasic v. Heinemann 's Bakery, 1997 W.L. 426945 (7th Cir., July 30, 1997) (quoting Waldridge v. American Hoechst Corp., 24 F.3d 918, 921-22 (7th Cir.1994)). Coleman's unsupported and unargued parenthetical statement that it did not concede that Texas law governed the transaction was not enough to prevent its waiver of the issue. In addition to upholding a district court's determination that an argument has been waived by not being presented in accordance with local rules for contesting summary judgment, Brasic, supra, it is axiomatic that arguments not properly presented to the district court are waived on appeal. Erff v. Markhon Industries, Inc., 781 F.2d 613, 618 (7th Cir.1986) (argument waived where party "failed to properly present [it] to the district court in a lawyer-like fashion"). Cf. United States v. South, 28 F.3d 619, 629 (7th Cir.1994) (when appellant offers no argument in support of his allegations, the argument is waived because such "nonchalant treatment ... leads us to conclude that he considers the inquiry of little consequence"); United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir.1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.... ").
 
 
 33
 Coleman also cites us to a second pleading to support its contention that it did not waive choice of law arguments. In its objection to Shell's petition for attorney's fees Coleman raised the issue again. But at that point in the proceeding it had already waived the issue. Oates v. Discovery Zone, 116 F.3d 1161, 1168 (7th Cir.1997) (argument waived where presented to district court only after summary judgment entered). Shell moved to strike that portion of Coleman's objection dealing with choice of law on the ground the issue had already been decided on summary judgment. The court took. it under advisement but never reached the issue, instead ruling in favor of Shell on its petition for attorney's fees. Even now, Coleman is appealing, not the petition for attorneys' fees, but the district court's determination on summary judgment that Texas law governed the case. While Coleman raises many issues of disagreement with that determination, they were not presented at the appropriate time to the district court and were waived.
 
 III.
 
 34
 To sum up, Coleman has not presented any language which can reasonably be read to create an express warranty that Elexar is compatible with PVC containing plasticizers. Nor has Coleman presented us with any communications or actions by which a reasonable person could find an implied warranty that the products were compatible. The question of whether Shell successfully disclaimed any warranties with the language on the invoice is moot as we do not find any warranty in the first place. Coleman also has not alleged facts by which one could reasonably conclude that Shell intentionally and fraudulently misled Underwriters Laboratories in an effort to further mislead Coleman. Finally, Coleman waived the choice of law issue by not contesting it at summary judgment in the district court. Accordingly, we affirm the district court.
 
 
 
 [1]
 Coleman cites Continental Sand & Gravel, Inc. v. K & K Sand & Gravel, Inc., 755 F.2d 87, 90 (7th Cir.1985), for this proposition. Deriving this principle from Continental requires some imagination. However, the proposition was more explicitly stated in Little Rock School Dist. v. Celotex Corp., 574 S.W.2d 669, 673 (Ark.1978) ("It is well recognized that an express warranty may be inferred from statements and affirmations by a seller ... which induce the purchase and on which the buyer relies and the seller intended that the buyer should do so."), a case and proposition cited with approval by the Texas Supreme Court in Safeway Stores, Inc. v. Certainteed Corp., 710 S.W.2d 544, 548 (Tex.1986). Coleman cites neither case. Nevertheless, as discussed below, Texas law controls our determination
 
 
 [2]
 As discussed below at pp. 9-10, Coleman disputes that Texas law governs this case, arguing instead for application of Illinois law. The dispute appears to center only on the award of attorney's fees in Shell's counterclaim; Coleman as well as Shell cite cases from both Texas and Illinois in support of their substantive arguments. As their arguments involve issues arising under the UCC this is not surprising. Nevertheless, having concluded below that Texas law governs, we cite only to Texas cases and statutes
 
 
 [3]
 Coleman's allegations also likely do not satisfy the third requirement for recovery based on an implied warranty theory, namely that the plaintiff relied on the seller's selection of the goods. In this case the record demonstrates that Coleman knew there were compatibility problems with Garaprene jacketing and thermoplastic insulation. Coleman had had contact compatibility problems before when it was using Garaprene NS308 with another thermoplastic. It was not reasonable for Coleman to assume Elexar was compatible with Garaprene without making further inquiry of Shell
 
 
 [4]
 We need not reach the question of whether disclaimer of warranties contained in a sales invoice mailed to Coleman at the time of the Elexar shipments became part of the contract between Shell and Coleman because, having concluded there was neither an express or implied warranty, the issue is moot
 
 
 [5]
 Texas common law fraud requires proof of justifiable reliance rather than reasonable reliance. See Haralson v. E.F. Hutton Group, Inc., 919 F.2d 1014, 1025 n. 4 (5th Cir.1990) (explaining Texas fraud statutes) The difference is immaterial here where Underwriters Laboratories itself did not permit reliance on its information unless parties complied with its requirements