JOHN BOWMAN *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. ROBERT ZIMNY *et al.*, Defendants-Appellants and Cross-Appellees.

First District (2nd Division)  No. 1—92—0817

Opinion filed November 16, 1993.

Gerald Haberkorn, of Levin, McParland, Phillips, Leydig & Haberkorn, of Chicago, for appellants.

Callahan, Fitzpatrick, LaKoma & McGlynn, of Oak Brook (Eugene G. Callahan, Matthew W. LaKoma, and Mark L. LeFevour, of counsel), for appellees.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiffs John and Alicia Bowman brought suit against defendants Robert and Patricia Zimny for fraud and breach of contract resulting from the sale of a house. Although a jury found in favor of defendants on the fraud count, it found for plaintiffs on the breach of contract count and awarded them $35,000. On appeal, defendants contend that the jury's verdict is not supported by the evidence and therefore must be overturned.[1]

At trial, the following evidence was presented. In September

_____

[1]Plaintiffs initially filed a cross-appeal challenging the jury's verdict in

1986, plaintiffs entered into a contract for the purchase of defendants' home, which was located at 82 Horseshoe Lane, in Lemont, Illinois. The contract called for a purchase price of $262,000, and included all the appliances, as well as a riding lawn mower, a snow blower, and several pieces of furniture. Plaintiffs' attorney typed into the section entitled "GENERAL CONDITIONS AND STIPULATIONS" of the standard form contract a provision which stated:

"Sellers warrant and represent that all appliances, plumbing, heating and cooling and electrical systems are in good working condition and are not in need of repair."

After the contract was signed, plaintiffs had difficulty obtaining financing and sought to postpone the closing. Defendants agreed to extend the closing date because they were not ready to leave the home. Barbara Peting, defendants' real estate agent, spoke with plaintiffs "several times" during this period in order to help them obtain the necessary financing. During these conversations, Peting told Alicia Bowman that she was a social friend of defendants and that she had been there many times as their guest at barbecues and pool parties.

In December 1986, Robert Zimny called Peting to tell her that he had received another offer for the house and was going to accept it. Peting became "upset" and told him that he was obligated to sell the home to plaintiffs. Zimny then told her that even though the listing had already run out and she would lose the commission from the contract with plaintiffs, she "would be taken care of." She replied that she "couldn't accept anything from [him] because [her] license meant too much to [her]." Peting then called plaintiffs and told them that defendants were going to sell the house to a third party. Plaintiffs then sued to enforce the contract, and the circuit court ordered defendants to sell the home to them. Approximately three weeks later, on January 23, 1987, the closing was held. Defendants did not attend the closing because they were "upset" that they had to sell the house to plaintiffs.

Although the contract provided that plaintiffs had "the right to enter into and inspect the premises" prior to closing, no inspection was made until they took possession of the home on the evening of February 27, 1987. Peting had suggested to them that such an inspection would be pointless because defendants were allowed to remain in the home for up to 60 days for $85 per day, and because of the "hostility" and "the bad feelings that were taking place." The

favor of defendants on the issue of fraud; however, that cross-appeal was voluntarily dismissed on January 27, 1993.

possession agreement did provide that plaintiffs had "the right to inspect the premises when they have been vacated by [defendants] *** in order to assure that the premises are being delivered in the same condition as of the date of the [closing] with normal wear and tear excepted."

After defendants moved out on February 27th, Peting and her husband met plaintiffs at the house that very evening at approximately 7:30 p.m. Because it was dark and there were very few overhead light fixtures in the home, they were unable to conduct a complete inspection. Instead, plaintiffs were able to take only a quick "walk through" in order to determine that the house was clean and in good condition. Although John Bowman noticed that the furnace was running, neither he nor Alicia used any of the plumbing, tried any of the appliances, or walked around the exterior of the house at that time. After spending approximately 30 minutes in the house, plaintiffs instructed Peting to release the escrow funds. As they exited the house through the front door, Alicia stepped on a piece of the face of a brick that was lying on the ground. After Peting postulated that the movers had accidentally knocked it off, the two couples went to dinner.

The next day, Alicia noticed that the faces of other bricks had fallen off and were "swept into the bushes that weren't visible." She then walked around the house and noticed that several bricks had fallen off the chimney and various other places around the house. About 45 days later, plaintiffs began experiencing difficulties with the furnace. The pilot light would not stay lit, and there were "periods [when] there was no heat." In addition, their daughter "started getting nose bleeds and [Alicia's] lips were cracking." A repairman came out to check the furnace and fixed the pilot light, as well as the humidifier and the electric air filtering system.

A short time later, when the first rain came, water started to collect in the basement. A repairman was called, and plaintiffs learned that two of the three sump pumps had "quit working completely" and had to be replaced. The central vacuum system would not work in the dining room or kitchen, but did work in other parts of the house. A repairman cleared the blockage. Also, the intercom and security systems did not function and repairs were undertaken; however, the security system was never properly repaired.

In the kitchen, the ceramic stovetop "cracked" and "caved in" and had to be replaced. The microwave, which was supposed to be "new" because the old one broke prior to the closing, was not a built-in unit, but a countertop model which "was propped up on wooden blocks *** to fit the opening that the other microwave had

filled." After a few weeks of use, the replacement oven "totally blew up" and had to be replaced. Moreover, the refrigerator stopped working within two months and had to be repaired. Both the washer and dryer also had difficulties and needed to be repaired.

Within three weeks of moving in, plaintiffs noticed a large water stain forming on the ceiling of the foyer. Upon investigation, they discovered that the shower in the master bath upstairs was leaking. The ceiling was replaced and the shower was retiled, but the problems persisted and plaintiffs were required to shower in the basement for approximately one year. Around the same time, there was an odor in the home because the motor in the septic tank stopped working; the motor was replaced and the tank was emptied and cleaned. Also, the in-ground sprinkler system did not work properly. The one time plaintiffs attempted to use it, it leaked into the basement, "spewing [water] all over the furnace room." The system was never fixed, however, because it was necessary to dig up the lawn in order to examine it before an estimate could be made.

Plaintiffs also had extensive problems with their pool. It would not hold water, and the filter system was defective and had to be replaced. Neither the pool's solar heating system nor the attached Jacuzzi's motor worked when they first tried to use the pool in the summer of 1987. Moreover, the roof over the garage began to leak almost immediately after plaintiffs moved in and the leaking spread through the rest of the house.

Plaintiffs testified to the condition of their home and the representations made to them about it by defendants and Peting. John Bowman also testified that he had incurred $26,301.30 in expenses resulting from repairs to the home and offered a summary detailing those expenses. He expressly excluded from that list, however, $1,700 he spent to replace the lawn mower engine, $1,000 to replace the water softener, and $1,800 to replace one of the air conditioners. Two expert witnesses also testified regarding the cause and effect of the problem and the cost of repairing the brick on the exterior of plaintiffs' home. It was estimated that the cost to repair the brick would be $29,950.

Plaintiffs offered into evidence as proof of fraud a summary of all their bills and expenses for the house, including the roof and swimming pool, from March 1987 through August 1991, totaling $26,301.30. They also offered into evidence a summary of their estimated future repair costs in 1991 and 1992. This second summary indicated that the furnaces, including the humidifiers and air filters, would be replaced in December 1991 at a cost of $6,000, and the brick work would be repaired at a cost of $29,950, for a total of $35,950.

Defendants testified that everything in the house was "working well" and "in good shape" when they moved out. Robert Zimny also stated that the in-ground sprinkler system cost between $4,700 and $4,900 to install in 1983.

As previously indicated, the jury found for defendants on the fraud count but against them and in favor of plaintiffs on the breach of contract count and awarded them $35,000 in damages. Defendants filed a post-trial motion requesting the court to overturn the jury's verdict because it was based on plaintiffs' total estimate of their expenses, including the repairs to the pool, bricks, and roof, which went to the fraud count rather than the breach of contract count. The circuit court denied the motion, stating that it was proper for the jury to consider those matters because the breach of contract count incorporated the allegations of the fraud count.

On appeal, defendants contend that the jury's damage award of $35,000 is "unquestionably outside the scope of the contract." They assert that that amount was based partly upon evidence regarding the condition of the brickwork on the house and the condition of the pool, and therefore was not related to the contractual clause limiting their responsibility to "the appliances, plumbing, heating and cooling and electrical systems." In response, plaintiffs maintain that "the jury's verdict is clearly supported by the evidence."[2]

■ The measure of damages for breach of contract is the amount that will compensate the aggrieved party for the loss "which either fulfillment of the contract would have prevented or which the breach of it has entailed." (*LeFevour v. Howorka* (1991), 224 Ill. App. 3d 428, 430-31, 586 N.E.2d 656.) Absolute certainty regarding the amount of damages is not necessary to justify recovery; rather, "the evidence need only tend to show a basis for the computation of damages with a fair degree of probability." (*Shaw v. Bridges-Gallagher, Inc.* (1988), 174 Ill. App. 3d 680, 684, 528 N.E.2d 1349.) Damages, however, cannot be based upon mere speculation or conjecture. (*Posner v. Davis* (1979), 76 Ill. App. 3d 638, 645, 395 N.E.2d 133.) Instead, an assessment of damages made without the necessary level of certainty will be

_____

[2]Plaintiffs also contended that the record on appeal was inadequate because defendants failed to file a complete report of proceedings in the circuit court as required by Supreme Court Rule 323. (134 Ill. 2d R. 323(a).) At oral argument, however, we invited plaintiffs to supplement the record with the missing portions of the transcript which they deemed relevant to our review of this matter. They have filed a supplemental record containing a transcript of the missing testimony, and we find that the current record on appeal is sufficient for our review.

considered to be against the manifest weight of the evidence and overturned on appeal. *Shaw*, 174 Ill. App. 3d at 684.

◼ In their brief, plaintiffs assert that they proved nearly $20,000 in itemized expenses for repair or replacement of items covered by the contract, and that the jury could have determined that another $15,000 would restore them to the position they would have occupied had the defects not existed. They maintain that the evidence established that they spent $6,000 for the replacement of the furnaces, $1,700 for the repair of the lawn mower, $1,000 for the replacement of the water softener, $1,800 for the replacement of the air conditioner, and $9,477.22 in miscellaneous expenses, for a grand total of $19,977.22. We note, however, that the costs associated with the repair of the lawn mower and the replacement of the water softener and air conditioner were specifically excluded from their claims by John Bowman's own testimony. Accordingly, plaintiffs' reliance on those figures at this late date is unwarranted and is merely an attempt to justify the verdict after the fact.

Moreover, of the $9,477.22 figure plaintiffs rely on, only $2,860.11 was related to "the appliances, plumbing, heating and cooling and electrical systems." That amount, in addition to the $6,000 spent on replacing the furnaces, provides $8,860.11 in damages proved at trial. Plaintiffs assert that their proposed $20,000 figure "does not include amounts for the replacement of the microwave, the repair and replacement of the in-ground sprinkler system, the leak and related damage in the plumbing in the upstairs shower, the repair of the broken Jacuzzi, the repair of the solar heating system, the repair of the burglar and fire alarm systems and the repair of the intercom system." While their statement is true, no evidence was presented regarding the cost of repair or replacement of those items or to their effect on the value of the home. Therefore, any award of damages based on those items would be mere speculation or conjecture.

Finally, any attempt to justify the award based on expenses incurred as a result of defects to the pool, brickwork or roof must be rejected because they were not contemplated by the clause under which plaintiffs sued. An award for contract damages cannot stand if it is based upon the failure to perform an action which the defendant had no duty to perform. (*Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 356 N.E.2d 565 (remanding for a re-assessment of damages where the circuit court awarded damages based partly on work he had no duty to perform).) Plaintiffs rely upon *Nisbet v. Yelnick* (1984), 124 Ill. App. 3d 466, 472, 464 N.E.2d 781, for the proposition that "[a] party cannot be permitted to escape liability *** simply because the *** damages are difficult to prove." However, in this

case, rather than setting the damages based on the specific evidence of costs relating to "the appliances, plumbing, heating and cooling and electrical systems," the jury apparently determined that plaintiffs should be awarded $35,000 as a setoff against their estimated future repair expenses which may have included repairs to the brickwork. Therefore, because plaintiffs have failed to demonstrate their damages with reasonable certainty, we vacate the judgment and remand for appropriate proceedings to determine proper damages.

For the foregoing reasons, the judgment of the circuit court of Cook County is vacated and the cause remanded for proceedings not inconsistent with this opinion.

Vacated and remanded.

HARTMAN and SCARIANO, JJ., concur.