**UNIVERSAL BANKCARD SYSTEMS, INC., Plaintiff,**

v.

**BANKCARD AMERICA, INC., et al., Defendants.**

No. 93 C 1969.

United States District Court, N.D. Illinois, Eastern Division.

March 30, 1998.

---

George W. Hamman, Aimee M. Devereux, Jeanne Marie Hoffman, Hamman & Benn, Chicago, IL, for Plaintiff.

Jeffrey Scott Sell, Edelman & Combs, Chicago, IL, Michael Hugh Burny, Andrey B. Filipowicz & Associates, Chicago, IL, David A. Novoselsky, David A. Novoselsky & Associates, Chicago, IL, Forrest L. Ingram, John O. Noland, Jr., Chicago, IL, Andrey Bohdan Filipowicz, Chicago, IL, for Defendants.

## OPINION AND ORDER (ISSUED MARCH 30, 1988)

POSNER, Chief Circuit Judge, Sitting by Designation.

I have before me the defendants' motion for judgment as a matter of law. Fed. R.Civ.P. 50(a)(1). It was submitted at the close of the plaintiff's case in chief, and I said that I would reserve my ruling until after the jury rendered its verdict. See, e.g., *Mosser v. Fruehauf Corp.*, 940 F.2d 77, 83 n. 2 (4th Cir.1991); *Norton v. Snapper Power Equipment*, 806 F.2d 1545, 1547–48 (11th Cir.1987); *Nichols Construction Corp. v. Cessna Aircraft Co.*, 808 F.2d 340, 354–56 (5th Cir.1985). The jury has now done so. It awarded the plaintiff $4,090,668 against the corporate defendant, Bankcard America, Inc., on the breach of contract count, but exonerated the individual defendants, Samuel Buchbinder and Paul Alperstein, who had been charged with violations of RICO but not with breach of contract. So judgment in favor of Buchbinder and Alperstein should clearly be entered forthwith, and the part of the defen-

dants' motion for judgment that discusses the RICO counts is therefore moot and need not be discussed.

I must sketch in some background in order to make the contract, and Bankcard's motion for judgment as a matter of law insofar as it relates to the contract, intelligible. Bankcard was in the business of credit card processing. It was what is called in the industry an "ISO" (Independent Sales Organization). An ISO contracts with a bank to obtain merchants who will clear their credit card sales through the bank. The ISO is responsible for signing up the merchant, installing the necessary equipment (a computer terminal with phone connections and a slot for "swiping" the credit card), and servicing the account, which involves keeping the equipment in running order, answering the merchant's questions, and attending to his complaints. The standard methods by which the ISO is compensated for these various services are by its selling or leasing the terminal equipment to the merchant at a profit and by receiving what the industry calls "residuals." These residuals are a fraction of the price of each credit card sale that the merchant clears through the ISO's bank. The typical ISO's income will therefore consist of equipment and residual income, and to obtain the two kinds of income the ISO will employ a sales force (often on a pure commission basis) plus installers and other service, clerical, and administrative personnel.

Besides ISOs that operate in the manner just described, which are called "lead" or "direct" ISOs because they have a contract with the bank, there are "sub-ISOs." These operate as agents of the direct ISOs. The lead ISO delegates the sale, installation, and servicing functions to the sub-ISO. The sub-ISO's income consists of income from the sale or leasing of the terminal equipment (which the sub-ISO may, and in the plaintiff's case did, obtain directly from computer companies rather than from its lead ISO), plus a share of the residuals received by the lead ISO. The share generally is not fixed, but depends on the price that the sub-ISO negotiates with each merchant. In effect, the lead ISO sets a minimum price which gives it a specified residual fraction. The difference

between that price and the price that the merchant pays the sub-ISO is the latter's share of the residuals that the account generates. A sub-ISO, like a lead ISO, employs sales, service, and clerical personnel.

When a sub-ISO signs up a merchant, it sends the merchant's application to the lead ISO, which in turns seeks the bank's approval of the application. If approval is given, and the terminal is installed, and the merchant begins clearing credit card sales through it, residuals will be generated and the bank will remit the residuals due to the lead ISO under the bank's contract with it to that ISO. The lead ISO will then cut a check to the sub-ISO for the latter's share of the residuals.

The contract involved in this lawsuit was originally made on October 9, 1991, and was amended the following month. The contract was between Bankcard as lead ISO and Universal Bankcard Systems, Inc., the plaintiff, as sub-ISO. The contract was for a two-year term (renewable for a second term at Universal's option), but could be terminated by either party without cause on thirty days' notice. The contract forbade Universal to convert, or roll over, accounts (unless it had a preexisting relation with the merchant)—that is, to transfer them to a bank different from the bank that Bankcard represented (First State Bank and Trust Company of Park Ridge, Illinois) and thus deprive Bankcard of its share of the residuals and deprive the bank of its fee. The contract required Universal to use its best efforts to sign up merchants for Bankcard, and made Universal responsible for all customer service as defined—very broadly—in the contract.

Another provision of the contract entitles Universal to "receive residuals over the lifetime of its accounts as long as the ISO services the account, . . . whether or not this Agreement has been terminated." Yet another provision entitles Bankcard to "sell, at its sole discretion, any portion or all of its merchant base, and in said event, upon the completion of said sale to a bona fide third party, the right of [Universal] to receive residuals arising from said accounts shall cease."

The parties eventually fell out, as I'll explain in a moment, and on March 30, 1993, Bankcard sent Universal a letter terminating the contract, for cause, effective immediately, and stopped paying Universal any residuals. On April 1, 1995, Bankcard sold the portion of its merchant base that contained the only remaining merchant accounts, thirty in number according to Bankcard, that had been signed up by Universal. I ruled as a matter of law that the sale was to a bona fide third party within the meaning of the contract and therefore that after the date of the sale Universal was in no event entitled to residuals on the accounts for which it had submitted applications to Bankcard. As will become clear later, this ruling is not material to my decision on Bankcard's motion for judgment as a matter of law.

The termination letter cited lack of success in signing up merchants (presumably a violation of the best-efforts clause), failure to service accounts, and conversion of accounts. Universal conceded that it had converted four accounts (and the uncontradicted evidence established a fifth conversion) from Bankcard and Park Ridge, but presented evidence that Bankcard had waived these violations of the contract. On whether Universal performed its service obligations, the evidence was in conflict and thus presented a jury issue. As for lack of production, although Bankcard's and Universal's records showed that over the entire eighteen-month period of their relation Universal had signed up only 181 merchants, Universal presented evidence that Bankcard had appropriated a large number of merchant accounts (perhaps as many as 2,000) submitted by Universal for approval. This evidence consisted of testimony by two witnesses (one of whom gave a much lower figure) with no documentary backing; Universal's president, Richard Rothberg, testified that an employee had accidentally discarded copies of all the merchant applications that Universal had sent Bankcard. But I cannot say that a rational jury could not believe the testimony, which although implausible was not incredible as a matter of law.

Bankcard's alleged conversion of Universal's applications constituted in turn the principal ground for Universal's claim that Bankcard had broken the contract. Universal also presented evidence that Bankcard had failed to pay it the full residuals to which it was entitled by the contract even for those accounts that Bankcard had not taken for itself. Universal also pointed out that Bankcard had terminated it without giving the thirty-day notice required by the contract, and it presented some evidence that Bankcard had violated rules of Visa and Mastercard, though with what consequences the evidence did not reveal.

■ Bankcard's motion for judgment as a matter of law argues both that Universal's claim of breach of contract has no merit and that Universal has not presented evidence that would justify any award of damages for the alleged breach. I reject the first argument. There was enough evidence, though only barely enough, of a breach by Bankcard (and of no offsetting breach by Universal) to make the issue of Bankcard's liability under the contract one for the jury to decide. So let me turn to the question whether there was enough evidence to support *any* award of damages. I emphasize that it is a separate question from whether the jury's award of damages in excess of $4 million for the breach of contract was so excessive as to require a new trial on damages. It plainly was, as will become apparent; but that is different from whether a rational jury could award any damages.

In response to the motion, Universal pointed mainly to the testimony of its president, Rothberg; to "the business records of his company, including the corporate tax returns and his accountant's analysis of the losses sustained by Universal as a proximate cause of Bankcard's breach of the ... contract"; and to testimony by a former employee of Bankcard's, Richard Borden, to the effect that the average merchant account has an average value of $350 to an ISO or sub-ISO. (Borden's actual testimony was that the average value of an account was between $250 and $300.) The damages sought, as summarized in a portion of the jury instructions to which Universal did not object, were limited to "lost net profits from residuals that Universal claims that Bankcard owed it but nev-

er paid" (and recall that Universal's entitlement to residuals was cut off as of April 1, 1995) and "lost net profits from the sale or lease of [terminal] equipment from October 1991 through April 30, 1993, 30 days after Bankcard issued its letter of termination." Universal sought additional damages for the RICO violations, but the jury's verdict on the RICO counts eliminates that damages claim from the case. I add, however, that the claim had no evidentiary basis, and indeed entered fantasy land in seeking $289 million in damages for new business allegedly lost by reason of the RICO violations—this for a company that, according to Universal's own evidence, never had a year in which its sales revenues reached $1 million or in which it earned a profit.

Universal's "business records" evidence in support of its claim for damages for breach of contract was nil. The company's corporate tax returns were placed in evidence, but no witness explained them to the jury and in any event they contain no information from which losses due to the breach of contract could be estimated. The returns do list expenses, but in very broad categories, such as "amortization," "telephone," and "office expense," with no further breakdown. Universal was a lead ISO for two banks for which it signed up more than 2,000 merchant accounts (though over a period somewhat longer than the contract damages period), as well as being a sub-ISO of Bankcard, and the tax returns contain no allocation of the profits or losses of the business to these different aspects of Universal's business. The record is silent on whether Universal's dealings with the other banks generated profits or losses. Bankcard is not responsible for whatever losses Universal may have experienced with the other banks. There is no evidence of a connection, and in any event consequential damages for the breach of contract were not sought, were not proved, and as a matter of contract law were not a permissible remedy for the breach. I note that as well as not seeking consequential damages, Universal did not seek restitutionary recovery, as it might conceivably have done with respect to its losses or Bankcard's gains from the alleged misappropriation of merchant accounts that Universal had submitted to Bankcard.

As for the "accountant's analysis of the losses sustained by Universal as a proximate cause of Bankcard's breach of the ... contract," no such analysis was presented. The reference may be to the report of an expert witness whom I refused to permit to testify, and of course his report was not in evidence either. The reference could conceivably be to a document that is in the record, captioned "Tax return analysis," but it is merely a summary of the information in the tax returns. Like the returns themselves, it contains no information from which "the losses sustained by Universal as a proximate cause of Bankcard's breach of the ... contract" can be estimated. Nor did any witness attempt to explain the summary to the jury.

The evidence on which any award of damages had to be based was limited to testimony. Although there is nothing in principle to prevent basing a damages award purely on testimony, the testimony must contain enough information to enable the jurors, from their notes and recollections, aided by explanations made in the closing arguments, to quantify the plaintiff's loss. Obviously it must, at the very minimum, establish that there *was* a loss due to the defendant's violation of law. Universal's testimony did not do even that.

The evidence did establish, what is anyway obvious, that a merchant account has a value to a sub-ISO. Bankcard's records showed that Universal's average merchant account yielded Universal $13 a month, or $156 a year. Since the jury could have found that Bankcard had confiscated residuals due Universal, the higher annual figure—$275 or, giving Universal all the benefit of the doubt, $300—to which Borden testified must be accepted for purposes of evaluating the motion for judgment as a matter of law. There was also testimony that the average revenue (in a sense to be explained in a moment) from the sale or lease of terminals to new accounts, together with associated printer and paper sales, was $712, and, again, if Universal's evidence of breach is credited, as it must be, then I must assume that Universal lost this revenue on a considerable number of accounts by reason of the breach.

The problem, which I reminded Universal's counsel of a number of times during the trial, but to no avail, is that both figures, the $300 and the $712, are estimates of *gross* revenue. True, some expenses were netted out, such as the price that Universal paid for the equipment, but the record does not reveal what percentage of either Universal's total expenses, or the expenses allocable to the performance of its contract with Bankcard, was netted out, and that is why the $300 and $712 figures must be regarded as gross rather than net figures.

■ Damages for breach of contract, as for other business losses, are based, of course, on *net* revenue, not gross revenue. If a buyer's breach of contract causes a seller to lose a $100 sale, but it would have cost him $90 to make the sale, his damages are $10, not $100. This is the most fundamental principle of the law of contract damages, but the only evidence presented concerning Universal's contract damages was the evidence I have noted of loss of gross revenue, with the exception of Rothberg's testimony that it costs $4,000 a year to "support" a salesman, whatever exactly that means. He did not elaborate, and since the testimony was offered in the plaintiff's rebuttal case, it is in any event irrelevant to Bankcard's motion for judgment as a matter of law offered at the end of the plaintiff's case in chief.

Obviously Universal had costs of doing business; otherwise, given that it had merchant accounts from the banks of which it was a lead ISO, plus some revenues from the 181 accounts with Bankcard that the latter acknowledged, the flood of red ink in its income tax returns (it had a net loss of almost $1.5 million during the first year after it signed the contract with Bankcard) would be inexplicable. Remember that the contract entitled it to residuals only so long as it serviced the accounts, and it costs money to provide service. The tax returns reveal that Universal had many costs, including salaries, commissions for its sale force, rent, payroll and other taxes, advertising, telephone, legal and accounting expenses, application fees (Universal was required by the contract to pay Bankcard $95 for every application that it forwarded to Bankcard), and many more.

Rothberg testified that he had paid top salaries for the executives that he hired to help him in the business—up to $150,000. One $150,000 salary would eat up 50 percent of the revenue of 1,000 accounts at Borden's maximum estimate of $300 per account. Add $95,000 in application fees and the 1,000 accounts generate only $55 per account in "net" revenue the first year—and it is not really net revenue, because all the company's other costs have been ignored.

Nowhere in the testimony or documents is there information on which a rational jury could base an estimate of Universal's costs and of how they would have been affected by the added business which Universal would have had if Bankcard had honored the contract. It is conceivable, although we are about to see unlikely, that a large fraction of these costs were fixed and thus would not have been increased at all by additional business, and in that event most of the lost revenue would have gone directly to the bottom line. See, e.g., *Schatz v. Abbott Laboratories, Inc.*, 51 Ill.2d 143, 281 N.E.2d 323, 326 (1972); *Hill v. Names & Addresses, Inc.*, 212 Ill.App.3d 1065, 157 Ill.Dec. 66, 571 N.E.2d 1085, 1097 (1991); *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 484 (7th Cir.1980) (Illinois law); *Autotrol Corp. v. Continental Water Systems Corp.*, 918 F.2d 689 (7th Cir.1990). But no *evidence* was presented on this question, and so the jury was left to speculate; and under the law of Illinois, which governs the contract issues in this suit by virtue of a provision in the contract, as under contract law generally, a jury is not permitted to base an award of damages on speculation or guesswork. *Bowman v. Zimny*, 256 Ill.App.3d 386, 194 Ill.Dec. 887, 628 N.E.2d 384, 388 (1993); *Ouwenga v. Nu–Way Ag, Inc.*, 239 Ill.App.3d 518, 178 Ill.Dec. 562, 604 N.E.2d 1085, 1089 (1992).

In fact it is evident from the uncontradicted evidence that to obtain and service additional accounts Universal would have had to expand its staff. Rothberg testified that today his business, which though much diminished continues, employs only four people; and the evidence showed that it shrank steadily throughout the complaint period. This means that, at the same time that Uni-

versal was losing revenue because of the alleged breach, it was shedding costs because it didn't need as large a staff as it had expected to need. An example is those $150,000 salaries. When business began to fall off, Rothberg quickly cut those salaries in half, and some of the employees—within a year all, according to the tax returns—whose salaries were cut quit rather than accept the cut. If the staff shrank rapidly when business fell, the inescapable implication is that it would have had to expand rapidly, meaning that costs would have risen, had the business grown, as it would have done but for the breach. Those higher costs were saved by the breach. The savings had to be subtracted from the revenues that Universal allegedly lost to yield a lost-profit figure, and no effort to do that was made.

 It might seem that if there was a breach, as I am bound to conclude for purposes of considering this motion that there was, it *must* have caused *some* harm to Universal. But this is not correct. There are losing contracts, a breach of which saves the victim money, and maybe this contract was one; this would be consistent with Universal's efforts to prove the individual defendants' rapacity and cunning. In any event, a plaintiff who fails to quantify, however roughly, the harm that he has suffered is not entitled to an award of damages, other than (in the case of a breach of contract) nominal damages, which Universal has not sought. Illinois law is clear that a plaintiff cannot recover lost profits if he presents no evidence of his revenues *minus his costs. Madigan Bros., Inc. v. Melrose Shopping Center Co.,* 198 Ill.App.3d 1083, 145 Ill.Dec. 112, 556 N.E.2d 730, 735 (1990); *Kenny Construction Co. v. Hinsdale Sanitary District,* 111 Ill. App.3d 690, 67 Ill.Dec. 274, 444 N.E.2d 510, 517–18 (1982); *S.A. Maxwell Co. v. DeSoto, Inc.,* 73 Ill.App.3d 844, 29 Ill.Dec. 476, 392 N.E.2d 33, 38 (1979). Granted, even in a case in which there is a complete failure of proof on the amount of damages to which the plaintiff is entitled, there is authority that the trial judge can order a new trial in lieu of entering judgment for the defendant and thus terminating the litigation. *Network Publications, Inc. v. Ellis Graphics Corp.,* 959 F.2d 212, 213–14 (11th Cir.1992); 9A

Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2538, pp. 357–59 (2d ed.1995). I assume that I have this power, but I do not consider this an appropriate case for its exercise. The case has been tried twice already, and the plaintiff was on clear notice from my first pretrial conference with its counsel, months before the second trial began, that it had to make a *responsible* showing of the *actual* loss *reasonably* traceable to the breach of contract and the other violations alleged. This is not an esoteric requirement of the law. Illinois caselaw is clear: the costs of performing a contract must be netted out from revenues in order to estimate the damages from the breach. Despite clear notice from the cases, despite the common sense basis of the rule, and despite repeated warnings from me, the plaintiff made no effort to introduce such evidence. This leads me to believe that the evidence does not exist—that in fact the plaintiff suffered no quantifiable harm from the alleged breach, that its business reverses are due to other factors such as Rothberg's inexperience (he entered the credit card processing business, very shortly before the contract with Bankcard, from the garment business), his sloppy record-keeping (to which he testified), the restrictions (to which he also testified) that the banks for which he was a lead ISO placed on his soliciting of business, and the highly competitive nature of the business. As I pointed out earlier, there are losing contracts, the breach of which does not hurt and may even help the victim, and the contract with Bankcard may well have been one of them.

For the reasons explained in this opinion, I direct the clerk to enter judgment for Bankcard, as well as for the individual defendants. Should Universal appeal and the court of appeals reverse this judgment, I recommend to that court that it order a new trial with respect to contract damages because the jury's damages award was grossly excessive, given the evidence.

SO ORDERED.