**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240424-U

Order filed April 15, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| RAYMOND WINKLER, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Du Page County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-24-0424 |
| | ) | Circuit No. 20-L-1430 |
| DANNA POOLS, INC., | ) | |
| | ) | Honorable |
| Defendant-Appellee. | ) | David E. Schwartz, |
| | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices Hettel and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The trial court's finding that plaintiff failed to prove damages in connection with defendant's breach of contract was not against the manifest weight of the evidence. Affirmed.

¶ 2    Plaintiff, Raymond Winkler, appeals from the trial court's judgment for defendant, Danna Pools, Inc. (DPI), following a bench trial. Winkler argues that the court's finding that he failed to adequately prove the damages suffered in connection with DPI's breach of contract regarding the

construction of the swimming pool at Winkler's residence was against the manifest weight of the evidence. For the reasons set forth below, we affirm.

¶ 3                                I. BACKGROUND

¶ 4        In February 2019, the parties entered into a contract providing that Winkler would pay DPI $98,000 for DPI's construction of an in-ground swimming pool at his residence. The payments were to be made in installments at different stages of construction. Section 4 of the contract provided, in relevant part, as follows:

> "DPI guarantees its work to be free from defects in material and workmanship for a period of (14) Months from the date pool is filled with water. *** If maintenance, service, or warranty work is performed by anyone other than DPI ***, all warranties and guarantees will be voided."

The pool was filled with water in July 2019, and Winkler enjoyed it for the season.

¶ 5        A July 9, 2019, maintenance ticket shows that DPI provided vacuuming services and conducted a chemical test on the pool. A July 15, 2019, service work order details that DPI performed maintenance on the pool, delivered a customer maintenance kit, trained Winkler in customer maintenance, showed Winkler "how to test water using test kit and salt strips" and explained the appropriate chemical levels, and demonstrated how to clean the pump basket. The work order also includes a note that Winkler "stated he knew how to maintain pool and would be maint[ain]ing his own pool." A corresponding maintenance ticket from the same day shows that another vacuuming service and chemical test were performed by DPI, as well as "additional time going over with [Winkler] how to use test kit, equipment, and vacuum." Maintenance tickets dated July 26, 2019, and September 17, 2019, reflect additional vacuuming and chemical tests by DPI. A service work order dated September 17, 2019, shows that DPI addressed Winkler's concern that

scale was blowing out of the return pipes and the heater was making a noise. And finally, a November 22, 2019, invoice shows that DPI winterized Winkler's pool at the end of the season.

¶ 6        In April 2020, Winkler pulled back the cover of the pool in anticipation of its opening, at which time he noticed a crack in its foundation. Winkler testified that Daniel Kamide, DPI's sole shareholder, inspected the crack and suggested that DPI open the pool anyway and address the problem at the end of the season. Realizing that his 14-month warranty would expire by the end of the season, Winkler did not agree and, instead, drained the pool himself, revealing additional cracks. The parties communicated about the cracks over the course of the next three months, with DPI ultimately taking the position in a July 9, 2020, letter that Winkler "[k]nowingly voided the warranty" in section 4 of the contract; "[r]efused [DPI's] maintenance for most of 2019"; [r]efused to contract with [DPI] to perform the opening, closing, maintenance and service for 2020"; and "[i]gnored the warning about opening the pool with a hairline crack." DPI asserted that Winkler's actions caused the damage to the pool and denied any liability. In its letter, DPI noted that it "discussed assisting Winkler but he has rebuffed anything but a new pool."

¶ 7        On December 10, 2020, Winkler filed a complaint against DPI for breach of contract. Specifically, Winkler alleged, *inter alia*, that DPI failed to honor its 14-month warranty and repair the pool. Winkler claimed that he hired a contractor who informed him that, if only the plaster needed repair, the cost of repair would be $40,000, but that "[i]f the cracks extended through the concrete/gunite material[,] more extensive repairs would be required that could cost in excess of $100,000."

¶ 8        DPI denied that it breached the contract and asserted two affirmative defenses: (1) failure to mitigate damages and (2) invalidation. In support of failure to mitigate, DPI argued that, despite obtaining estimates to repair the cracks, Winkler did not take any action to repair them. As to

invalidation, DPI alleged that, in violation of section 4 of the contract, Winkler serviced his own pool when he opened it for the 2020 season and, in doing so, "drained the pool without checking and removing the hydrostatic valve located within main drain at bottom of pool which caused pressure to the pool resulting in the crack(s)." DPI also claimed that Winkler improperly used chemicals in the pool during 2019 because he did not have a DPI maintenance contract and, therefore, DPI was "not responsible for the check cracking."

¶ 9        In response to the affirmative defense of failure to mitigate damages, Winkler clarified, *inter alia*, that, while "he spoke to an engineer and a pool contractor regarding the cracks[,]" he never received an estimate to repair them. Regarding invalidation, Winkler denied that he "serviced" the pool within the meaning of section 4 of the contract and denied causing the cracks.

¶ 10        The bench trial commenced on April 8, 2024. Winkler testified to his discovery of the cracks and his subsequent communications with Kamide. He further testified that he understood that DPI training him to vacuum the pool and test the chemical levels meant that he was allowed to so without voiding the warranty. He also confirmed that he put the necessary chemicals into the pool himself. However, contrary to DPI's notes on the July 15, 2019, service work order, Winkler denied that he told DPI that he was going to maintain his own pool. He further denied refusing DPI's maintenance services in 2019, being offered a written service contract, or taking any actions that were not permitted under the warranty. Winkler testified that, prior to DPI's July 9, 2020, letter, Kamide suggested that the cracking could have been caused by DPI's receipt of improper cement but that it needed to be "engineered" to be sure. This was not done. On cross-examination, Winkler testified that, as of the date of trial, he had not had any work done on the cracks but that he had an engineer and a pool contractor come to his residence in 2020. He testified that he did

4

not have the soil surrounding the pool or the concrete itself tested. He confirmed that he used the pool from 2020 to 2023 and hoped to use it in 2024 as well.

¶ 11    Kamide was called as an adverse witness by Winkler, and his testimony included the following. In July 2020, DPI concluded that hydrostatic pressure caused the cracks. He explained that the cracks were primarily in the pool floor, which is where the most pressure existed. He also testified that improper chemical levels contributed to the cracking and that Winkler voided the warranty by adding chemicals to the pool independently and otherwise maintaining it himself. He said that Winkler declined DPI's verbal offers to provide maintenance services because Winkler had had a pool for 20 years prior and could manage it on his own. Kamide testified that customers can skim, vacuum, and test the chemical levels in their pools without voiding their warranties; however, they are not allowed to actually pour chemicals into the water. Customers must call DPI to add the chemicals in order to maintain the warranty.

¶ 12    Winkler next called his expert witness, Jinan Yan, a licensed professional engineer with a focus in geotechnical engineering. Yan described his focus as being "soil and foundations." He testified that, while he had never completed concrete work for a residential pool, he had extensive experience in foundational work for residential and commercial buildings.

¶ 13    Yan testified that if a concrete structure cracks, it is generally for one of two reasons: (1) the underlying soil is not compacted to 95% density, or (2) the concrete's water content is too high. First, if the soil is improperly compacted, it will be too weak to support the structure. This can cause uneven settlement and create a void beneath the concrete, resulting in cracking. The compaction level is tested in the field during construction using a nuclear gauge, and the results are usually recorded in the field notes. Second, concrete that is too moist is significantly weakened and prone to cracking. The water content of the concrete is also tested in the field during

5

construction using a slump test, the results of which are recorded in the field notes. Concrete that does not pass the slump test should be rejected. Yan testified that the field notes should be maintained by general contractors to protect themselves from liability and indicated that he did not review any of DPI's construction records prior to formulating his opinion.

¶ 14 When a crack is discovered *after* a structure is built and there are no field notes relating to construction, Yan testified that it is "very tough" to look under the concrete and determine the cause of the crack. However, it may be possible to do so with either a concrete coring cylinder or a ground penetrating radar (GPR). The concrete coring cylinder method involves removing a core of the existing concrete through a drilling process and inspecting the core. The resulting hole is then filled with new concrete. The GPR method, on the other hand, scans beneath the concrete for the existence of a void but will not produce accurate results if rebar or other metal material exists that might affect the scan. Yan recalled that he attempted to utilize the GPR method for Winkler's pool, but the results were inconclusive because there were too many rebars. He confirmed that the concrete coring cylinder method was not used on Winkler's pool.

¶ 15 Yan noted that the continuous crack across the entire pool indicated weakened soil or a structure failure. Therefore, while he had no specific data or test results to rely upon, his opinion was that a crack of this nature was caused by either improper compaction of the soil or poor quality concrete. He testified that the hydrostatic valve would not have caused the cracks.

¶ 16 Winkler rested his case, and DPI moved for a directed verdict, arguing that there was insufficient evidence to prove causation and damages. The court denied the motion. DPI rested its case without calling any witnesses.

¶ 17 The parties submitted written closing arguments. Winkler sought $98,000 in damages to replace the pool, which he described as a "conservative" figure because it excluded the cost of

6

demolishing the existing pool and diminution of the value of his property. DPI argued, *inter alia*, that Winkler failed to establish an appropriate measure of damages or that repairs were necessary at all. In his rebuttal to DPI's closing argument, Winkler claimed for the first time that the pool was leaking water, albeit not substantially. He asserted that replacement of the entire structure is necessary to ensure that the cracks do not reappear.

¶ 18        On May 30, 2024, the court entered judgment for DPI and read its findings and ruling into the record. A corresponding written order was entered the same day. Finding both parties' testimonies to be credible, the court noted that it was undisputed that DPI installed the pool and that its foundation was cracked. The court credited Yan's expert testimony that the cracks were caused by "poor quality cement or lack of compaction of the underlying backfill." The court found that the cracks were attributable to DPI, that breach of warranty was established, and that none of Winkler's independent maintenance on the pool voided the warranty or caused the cracks. The court continued,

> "However, the analysis does not end there. The real question is the assessment of damages. On this issue, the plaintiff has the burden of proof. There are two possible ways to prove damages[:] costs of repair or replacement of the pool. (The court also notes that plaintiff and his family have had full use of the pool since 2019 and aside from the appearance presented no evidence that they were prevented from enjoying the pool). However, if correction of the defects would entail an unreasonable destruction of the builder's work, the proper measure of damages is the reduction in value of the property. *Park v. Sohn*, 89 Ill. 2d 453 [(1982)].

> The plaintiff presented no evidence as to the cost of repair, leaving replacement as the only remedy. However, except for arguing that 'any remedy would require replacement

of the existing pool' there was also no evidence provided as to the cost. Additionally, based on the testimony of plaintiff himself it is clear that the pool does NOT need to be replaced. It has been fully functional from the beginning and there is no evidence that a simple repair of the cracks could not be undertaken. Plaintiff's expert witness offered no opinion as to the need for replacement.

There was no evidence presented that the cracks are in any way preventing the plaintiff and his family from full use of the pool. No one testified that anyone has been injured by the cracks or has been unable to use the pool. In his [rebuttal to DPI's closing argument], counsel alludes to a 'slow leak'; this was not testified to by any witness. Had there been testimony that the cracks were causing anything other than a cosmetic problem the need for replacement might arguably be appropriate. To asses [*sic*] the full cost of a new pool to defendant (even, as plaintiff suggests, eliminating the cost of the removal of the pool) would be excessive when there has been no evidence as to the cost of a simple repair of the cracks.

\*\*\*

The only other possible measure of damages would be the diminution in value of the property. Although plaintiff mentions this element of damages in his closing argument, no testimony was presented on this issue."

The court awarded Winkler zero damages, and this appeal followed.

¶ 19                                    II. ANALYSIS

¶ 20        On appeal, Winkler argues that the court's finding that he failed to present sufficient evidence of damages was against the manifest weight of the evidence. He argues that the appropriate measure of damages is the cost of repairs (in this case, replacement). In support, he

8

reasserts his argument that merely repairing the cracks would not resolve the issue, suggesting the possibility of a reoccurrence of the existing cracks and the potential for new cracks. He contends that his damages are proven through the original contract price—$98,000. Alternatively, Winkler requests that, in the event we conclude that the pool's cost and the destruction of the pool are disproportionate to the benefit he received, we remand the case for a determination of damages when measured by the diminution of value to his property.

¶ 21  An award of damages following a bench trial will not be disturbed unless it is against the manifest weight of the evidence. *King v. Find-A-Way Shipping, LLC*, 2020 IL App (1st) 191307, ¶ 28. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). To disturb a damages award, "we must find that the trial judge either ignored evidence or that its measure of damages was erroneous as a matter of law." *King*, 2020 IL App (1st) 191307, ¶ 28.

¶ 22  "The proper measure of damages for a breach of contract is the amount of money necessary to place the plaintiff in a position as if the contract had been performed. [Citation.] However, the claimant should not be placed in a better position, providing a windfall recovery." *In re Illinois Bell Telephone Link-Up II*, 2013 IL App (1st) 113349, ¶ 19. Damages are not intended to penalize the breaching party. *Meade v. Kubinski*, 277 Ill. App. 3d 1014, 1022 (1996). Damages are an essential element of a breach of contract claim, and a plaintiff's failure to adequately prove them will entitle a defendant to judgment as a matter of law. *In re Illinois Bell Telephone Link-Up II*, 2013 IL App (1st) 113349, ¶ 19.

¶ 23  Generally, when a builder fails to fully perform under a contract, damages should be calculated by the cost of correcting the defects. *Young v. Wilkinson*, 2022 IL App (4th) 220302,

¶ 87. "However, two exceptions exist: (1) when the defects can only be corrected at a cost unreasonably disproportionate to the benefit to the purchaser or (2) when correcting the defects would entail an unreasonable destruction of the builder's work." *Id.* If either of these exceptions apply, damages should be measured by the "amount by which the defects have reduced the value of the property." *Id.* Plaintiffs have the burden "not only to establish that [they] sustained damages but also to establish a reasonable basis for computation of those damages." *Naiditch v. Shaf Home Builders, Inc.*, 160 Ill. App. 3d 245, 267 (1987). Notwithstanding, the plaintiff need not prove the amount of damages with absolute certainty. *Shaw v. Bridges-Gallagher, Inc.*, 174 Ill. App. 3d 680, 684 (1988).

¶ 24      In his opening appellant brief, Winkler argues that Yan's testimony supports that the cracks would reappear if they were merely filled, thus necessitating replacement. However, the cited testimony reflects only Yan's explanation that improper soil density may have caused the cracks. At no point in his testimony did Yan opine as to what would happen if the cracks were repaired rather than the entire pool replaced. In fact, Yan's testimony never addressed what corrections would or would not be suitable to fix the cracks. Nor did any other witness or documentary evidence address this question. Instead, Winkler speculates as to the ineffectiveness of repairing the cracks in his pleadings, his rebuttal to DPI's closing argument, and his brief on appeal, notwithstanding that no supporting evidence was presented at trial.

¶ 25      Winkler does not cite any authority that allows a damages award in a breach of contract action where there was *no* evidence produced at trial to establish what corrections are necessary to remedy the breach. Winkler cannot arbitrarily select a remedy; rather, it is well-established that he is limited to that which is *necessary* to place him in the same position he would have been in had DPI adequately performed under the contract. See *In re Illinois Bell Telephone Link-Up II*, 2013

IL App (1st) 113349, ¶ 19 ("The proper measure of damages for a breach of contract action is the amount of money necessary to place the plaintiff in a position as if the contract had been performed. [Citation.] However, the claimant should not be placed in a better position, providing a windfall recovery."). Any other approach would risk providing Winkler with an impermissible windfall and penalize DPI.

¶ 26    Winkler asserts that, notwithstanding his failure to present any expert testimony or documentary evidence, total replacement is necessary. He essentially argues that the court should have applied its common sense to conclude that any other remedy would be insufficient because the cracks would reappear. However, without evidence in this regard, the court could not reasonably determine what corrections are warranted when cracks appear due to poor quality concrete or improper compaction of the underlying soil. For example, if the cracks were caused by settling from improper compaction of the soil, the court would have no way to know whether the pool would continue to settle and form additional cracks, or if it has already settled into its final position and merely filling the cracks would make Winkler whole. Accordingly, without evidence of what was necessary to cure DPI's breach of contract, any conclusion by the court that total replacement of the pool was necessary would have been improperly based on speculation and conjecture. See *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 108-09 (2006) (jury's personal familiarity with vehicles was insufficient to allow them to independently calculate the diminished value of the vehicle based on the vehicle's defect, reasoning that it would require them to engage in improper speculation and conjecture); see also *Bowman v. Zimny*, 256 Ill. App. 3d 386, 390-91 (1993) ("[A]n assessment of damages made without the necessary level of certainty will be considered to be against the manifest weight of the evidence."). Consequently, Winkler failed to

11

prove a reasonable basis for the calculation of damages, and DPI was entitled to judgment as a matter of law.

¶ 27 In the alternative, Winkler asks that we remand the case for a determination of damages under the diminution of value standard. In support, Winkler relies on *Mayfield v. Swafford*, 106 Ill. App. 3d 610, 616 (1982), for the proposition that the failure to award him any damages would penalize him and reward DPI. In *Mayfield*, homeowners sued a contractor for faulty construction of their swimming pool. *Id.* at 611. At trial, the court heard evidence of the cost of repairs through an engineer's detailed testimony of the corrections necessary and the estimated cost thereof, as well as a pool installer's testimony that the pool needed to be replaced entirely. *Id.* The trial court awarded the homeowners cost of repair damages that represented more than 150% of the contract price, which the reviewing court determined on appeal to be disproportionate to the benefit the homeowners received from the contract. *Id.* at 611, 615. Additionally, the repairs would have required a substantial reconstruction of the whole facility. *Id.* at 615. As such, the court determined that both exceptions to the general measure of damages applied and that the diminution of value measure of damages should be considered. *Id.* Noting that the homeowners did not present any evidence of the diminished value of their property at trial, the court held that it would be a "harsh" result to use this fact to enter judgment for the contractor outright. *Id.* at 616. Instead, the court remanded the case for a hearing on the diminution of value with instructions that the homeowners would be entitled to the lesser of the two measures of damages. *Id.*

¶ 28 Unlike the homeowners in *Mayfield* who presented (1) detailed testimony about what course of action would correct the deficits in their pool, and (2) the estimated cost of repairs, Winkler failed to present *any* evidence that falls within the first category. Accordingly, we are unable to determine the necessary cost of repair and compare it to the benefit received by Winkler

or whether the repairs would require an unreasonable destruction of the pool. Thus, the *Mayfield* court's rationale for remanding the case for a determination of damages under the diminution of value rule simply does not apply here. Moreover, case law disfavors remanding a case and allowing the trial court to hear additional evidence where the parties were afforded the full opportunity to present their cases and it is not alleged that the trial court wrongly refused evidence or that the trial was otherwise unfair. See *Midwest Software, Ltd. v. Willie Washer Manufacturing Co.*, 258 Ill. App. 3d 1029, 1056 (1994) (citing *Meeker v. Gray*, 142 Ill. App. 3d 717, 726 (1986)); *cf. Razor*, 222 Ill. 2d at 109-10 (remanding where the failure to present evidence of a reasonable basis to calculate damages was attributable to the trial court's improper exclusion of evidence). Simply put, remand to assess damages under these circumstances is inappropriate.

¶ 29                                    III. CONCLUSION

¶ 30        For the reasons stated herein, we affirm the judgment of the circuit court of Du Page County.

¶ 31        Affirmed.

13